## THOMAS & BETTS CO. et al. v. ELECTRICAL FITTINGS CORPORATION et al.

District Court, S. D. New York.
March 22, 1938.

Rehearing Denied April 23, 1938.

Bohleber & Ledbetter and John M. Montstream, all of New York City (William Bohleber and F. H. Fassett, both of New York City, of counsel), for plaintiffs.

Darby & Darby, of New York City (Floyd H. Crews, of New York City, of counsel), for defendants.

HULBERT, District Judge.

There will be a decree:

1. Sustaining the validity of claim No. 1, and

2. Holding invalid claim No. 2 of Letters Patent No. 1,769,947, and

3. Dismissing the Bill (a) as to contributory infringement, (b) for an injunction, and (c) for an accounting.

The Thomas & Betts Company of Elizabeth, New Jersey, and the National Electric Products Corp., of Pittsburgh, Pa., are New Jersey and Delaware corporations, respectively.

Electrical Fittings Corporation and Joselson Sales Corporation are New York corporations, each having its principal office at 27 Warren Street, New York, N. Y., in this District.

Since the incorporation of the latter in February, 1933, the defendant Samuel Joselson and Belle Joselson, his wife, have been President-Secretary and Treasurer, respectively, and sole stockholders, and together with Jack Joselson, a brother of Samuel, constituted the board of directors of Joselson Sales Corporation whose assets were acquired and liabilities assumed by the defendant Electrical Fittings Corporation upon its organization about June 7, 1935. Joselson Sales Corporation has not been active since.

Samuel Joselson is President-Secretary, Irving Tratter, Vice President-Treasurer, and together with Edwin J. Schneider, constitute the board of directors of the defendant Electrical Fittings Corporation. Of its outstanding shares of capital stock, Joselson owns one-half and Tratter and Schneider, one-quarter each.

On or about February 15, 1937, Efcor Sales Corporation was organized as a New York corporation. Tratter is President and Secretary, Schneider, Vice-President, and Joselson, Treasurer, and they are all of its directors and own the shares of its capital stock in the same proportion as in the Electrical Fittings Corporation.

Schneider and Tratter are connected with the Eastern Tube & Tool Company which manufactures armored cable and fibre bushings and Schneider is the President thereof.

On December 7, 1927, Otto A. Frederickson of Weathersfield, Connecticut, filed an application in United States Patent Office, Ser. No. 238,356 for "armored electric cable" and on October 9, 1928, there was issued to National Electric Products Corporation, one of the plaintiffs, as his assignee, Letters Patent No. 1,687,013.

Claims 2, 7, 8, 9 and 10 of this patent were held valid by the Circuit Court of Appeals, Second Circuit, in National Electric Products Corp. v. Circle Flexible Conduit Co., 62 F.2d 996.

Frederickson pointed out that armored cables in use prior to his patent were open to serious objections; usually they consisted of two or more conductors enclosed in an interlocked covering of insulated material of braided or woven fabric inserted in a spirally wound metallic jacket or sheath which, in commercial use, was cut off some distance from the end of the enclosed conductors in order to make attachments thereof to electrical fixtures. It was further necessary, after cutting the metallic sheath, to sever the interlocked fabric, also by cutting, and injury to the insulation covering the conductor wires was likely to result, or, in any event, the cut end portion of the metallic sheath left burrs or sharp edges liable to penetrate or cut into the insulation, thus creating a short circuit.

The important feature of the Frederickson patent consists of an insulated material of a fibrous nature and associated with the end of the cut metallic of the armor, jacket or sheath, is a sleeve or ferrule to be interposed between the insulated conductor and the interior of the metallic sheath, to avoid all cutting action by the sharp edges or burrs.

On or about July 2, 1928, James M. G. Fullman, filed an application in the United States Patent Office, Ser. No. 295,559 for "Connecter for Electric Conduits" and Letters Patent No. 1,769,947 were granted and issued July 8, 1930 to National Metal Molding Co., assignee of Fullman.

Prior to the alleged infringement complained of in this action, National Metal Molding Company, by instrument recorded in the Patent Office July 16, 1930, assigned said Letters Patent to National Electric Products Corporation, one of the plaintiffs herein, which is now vested with the legal title, subject to an exclusive license granted to the Thomas & Betts Company (record-

922

ed Nov. 25, 1933) and certain sub-licenses granted by the latter to manufacture and sell devices embodying the improved inventions claimed thereunder. These devices are two in number, designated as "set screw" and "clamp" connecters.

In the specification of the patent in suit, Fullman states: "In connecting electrical conduits and armored cables to outlet boxes and other electrical fittings it is usual to cut away the conduit wall or the sheath of the cable and to pass the unsheathed conductors into the box for making the desired electrical connections. In the use of metallic conduits, and particularly in the case of so called flexible metallic armored cable, this leaves a more or less ragged metallic edge which often abrades or cuts into the insulation on the exposed conductors, and is likely to cause short circuits and other injurious effects. In order to shield the exposed conductors from the edge of the cutaway metallic armor it has been proposed recently to provide a bushing of insulating material which can be slipped over the exposed conductors where the armor is cut away, and having a shoulder bearing against the sharp metallic edge of the armor, as shown and described in Letters Patent No. 1,687,013, dated · Oct. 9, 1928. (Frederickson Patent) When such a bushing is used at the joint between an armored cable and an outlet box with connecters of the present usual types, it is largely or altogether hidden within the connecter, so that its presence is not apparent to an inspector or other observer. The present invention provides an improved connecter binding the cable to the outlet box and having means for holding the insulating and protective bushing in place, which will permit the bushing to be visible and thus permit · ready inspection of the system."

The claims in suit are:

"1. The combination with an armored cable, of a bushing of insulating material having a tubular barrel portion contained within the cable armor and a shoulder bearing against the end of the armor, and, a connecter and means for securing it to the cable, said connecter having a portion projecting beyond the end of the cable armor and having inwardly projecting fingers adapted to bear upon the bushing shoulder and retain the bushing in place.

"2. The combination with an electrical conduit, of a bushing having a tubular barrel portion contained within the conduit and · a shoulder bearing against the end of the conduit, and a connecter and means for securing it to the conduit, said connecter having means for retaining the bushing in place while leaving it visible to ocular · inspection."

There was offered in evidence (Plaintiffs' Ex. 17) a type of set screw connecter conceded to have been in use for many years and of which the set screw type of plaintiffs' connecter is a counterpart in every particular except one and in that respect the improvement constitutes the basis of the claimed invention.

The connecter is a metallic tube which has a screw or a clamp at the base and a circular threaded head which snugly fits into a circular opening of an outlet box. The armored cable passes through the connecter which is then fastened to it on the outside of the outlet box by the set screw (or clamp) and is further made fast on the inside by· screwing on a locknut. In the old type of connecter, the fiber bushing which was put over the sheath of, and between the connecter, and the armor cable, before the locknut was screwed on, was not at all times visible because the diameter of the mouth of the connecter is somewhat less than that of the barrel of the connecter itself and the insulated wires passing through the mouth fitted it snugly.

In the plaintiff's invention the rim at the mouth is cut down' in three places so that the remaining portions project inwardly like "fingers" as the plaintiff, in fact, designates them, adapted to bear upon the bushing shoulder and retain the bushing in place. The fiber bushing, usually of red color, may be seen through the space between the fingers called "peep holes". The "clamp" connecter differs · somewhat in construction from the "set screw" but that difference is not of any real materiality in the consideration and disposition of the issues here involved.

The National Electrical Code containing "Regulations of the National Board of Fire Underwriters for Electric Wiring and Apparatus" approved by American Standards Association, effective Nov. 1, 1933, contains the following provision:

"Article V—Section 505—Armored cable.

"(a) Approved armored cable, types AC or ACL may be used as the wiring

method, if the provisions of the following paragraphs of this section are observed."

"(e) Approved outlet boxes or fittings shall be installed at all outlet and switch points as provided in paragraph (a) of section 512. The cable shall be continuous from outlet to outlet, or from fitting to fitting, and the armor shall be mechanically and electrically connected to all fittings in a manner to substantially close the openings at entrance points and to hold the cable securely."

"(g) At all points where the armor terminates an approved fitting shall be provided to protect wires from abrasion, unless the design of the outlet boxes or fittings required by paragraph (e) of this section is such as to afford equivalent protection, and in addition, an approved insulating bushing or its equivalent approved protection shall be provided between the conductors and the armor. The connecter or clamp by which the armored cable is fastened to boxes or cabinets shall be of such design that the insulating bushing or its equivalent will be visible for inspection."

Section 512 provides: "(a) At each outlet, switch, or junction point of conduit, surface metal raceway, armored cable, electrical metallic tubing, or non-metallic sheathed cable, and at each outlet and switch point of concealed knob-and-tube work, an approved box shall be installed. At least six inches of free conductor shall be left at each outlet for the making up of joints or the connection of fixtures except where conductors are intended to loop through sockets, receptacles and similar devices without joints."

The National Electrical Code, effective Nov. 1, 1935, modifies the foregoing quoted provision by changing the designation of paragraph (g) to (d) and adds the following sentence: "This bushing will not be required with lead covered cables."

Plaintiffs' counsel, during the trial, and in their brief, stressed as one of the important elements supporting the patent in suit, the visibility of the red bushing through the peep-hole openings of the connecter, but it was not until after the plaintiff National Electric Products Corporation had acquired the patent rights of Fullman that the regulations of the National Board of Fire Underwriters were adopted, upon which the plaintiffs' counsel now further emphasizes the importance of that element.

Defendants cite in their answer to the bill of complaint, 22 patent exhibits. In their bill of particulars it is stated that they would rely upon all of those thus listed to show the state of the art and anticipations, and subsequently they gave formal notice that three additional patents would be relied upon, making a total of 25. On the trial, however, only ten were put in issue, of which 6 were considered by the Patent Office during the prosecution of the application which eventuated into the patent in suit.

A careful analysis of the patents of Fullman, No. 1,769,947; Frederickson, No. 1,687,013; Goehst, No. 681,416; Klein, No. 799,989; Freeman, No. 848,819; Hinsdill, No. 849,395; Gilbert, No. 949,628; Appleton, No. 1,192,150; Webster, No. 1,245,077; Casper, No. 1,279,256 and Perry, No. 1,585,688, has been made and the results are shown upon schedules appended hereto. All of them claim a bushing and visibility thereof. There are only two of such patents which need be discussed in any detail.

Specifically the extended elements of Casper do not bear upon, and they do not retain the bushing in place, such retention being indicated by threaded members between the bushing and a flange of the box wall. Further, the bushing in the Casper device does not bear upon the armored cable but upon a conduit which is not an element of the first claim of the Fullman patent.

In the Perry device the bushing is exterior of the armored cable and has a plurality of fingers extending away from the cable which do not bear upon the cable, thus these fingers are a part of the bushing and not a part of the connecter.

While the other elements of Claim No. 1 in suit may be found separately in the defendants' exhibit patents, in none of them is found the particular type of fingers having the double function of bearing upon the bushing and retaining the bushing in place; in fact, fingers are not found in defendants' exhibit patents having either one of these functions.

As the mechanical construction of these fingers is different from those of the exhibit patents and as they perform functions not found in those patents, the Court is of the opinion that they are more than a simple mechanical change from the prior art and that they exhibit an exercise of

an inventive thought, and that, therefore, claim No. 1 is valid.

■ Claim No. 2 of the patent in suit is broader than claim No. 1. It contains no reference to a connecter having fingers but refers to "a connecter", "means for securing it to the conduit" and "means for retaining the bushing in place"—all of which elements are found broadly in the exhibit patents. This claim includes also an electrical conduit, which is found in the patents of Goehst, Hinsdill, Gilbert and Casper,—the other patents omitting this element.

The Gilbert device includes practically all of the elements of this claim; while the Klein and Freeman devices do not include a conduit, they have otherwise the elements of the claim.

One of the elements of this claim is the visibility of the bushing (not mentioned in claim No. 1).

Having in mind the exhibit patents and the breadth of description of the elements of this claim, the Court is of the opinion that it would require but ordinary mechanical ability to produce the device of the claim with a knowledge of the prior art, and that claim No. 2 is invalid.

The defendants contend that the only difference between the set screw connecter in use for many years, and that shown in the patent in suit, is the fingers projecting inwardly and the little niches in the mouth, which are such trivial modifications that it does not amount to invention.

■ The widespread commercial success of a patented invention as indicated by its general acceptance throughout the trade is a motivating factor in resolving any doubt of the novelty and patentability of the device.

It is conceded by plaintiffs that they do not seek to have the claims in the Fullman patent given a construction broad enough to prevent anyone from using old and unpatented bushings, cables or conduits, with the peep-hole connecters furnished by the plaintiffs or their authorized licensees which, of course, they could not do. Bassick Mfg. Co. v. R. M. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251. There is no proof in this case that any effort has been made to effect price control. The plaintiffs' connecters are not, in my opinion, standard articles of commerce. There is no evidence in this case that commercial success was due to unusual promotion efforts. National Electric Products Corporation is only a nominal plaintiff, having granted to Thomas & Betts Company, as exclusive licensee, the right to sue and "to retain for its sole use and behoof any damages or royalties collected as a result of any such suit."

■ The bill of complaint alleges contributory infringement.

Sub-licenses were granted by the plaintiff to: M. B. Austin Company of Chicago, Ill.; The Rattan Manufacturing Company, New Haven, Conn.; Andrew Perry Company, Terryville, Conn.; Kwikon Company, Chicago, Ill.; Bridgeport Switch Company, Bridgeport, Conn.; Appleton Electric Company, Chicago, Ill.; Steel City Electric Company, Pittsburgh, Pa.; Conduit Fittings Corporation, Chicago, Ill. (who succeeded the Chicago Steel Tank Company of that city which had a license under the patent at one time); Reco-All Steel Co., South Bend, Ind. (succeeded the All Steel Equipment Company of Aurora, Ill., and the Appleton Manufacturing Company of South Bend, Ind., both of whom had licenses at one time).

A license was also issued to the Sterling Manufacturing Company "to manufacture and sell the connecters" under the patent in suit. The license provided in paragraph 11: "* * * nor shall the acceptance of royalty payments after breach or notice of termination preclude the exercise of any right of the Licensor hereunder. The termination of this agreement, either by cancellation or otherwise, shall not release the Licensee of any obligations accrued hereunder to the date such termination becomes effective, either for the payment of royalties or otherwise."

Paragraph 4 of the license contract provides: "4. The Licensee covenants and agrees to pay to the Licensor, or to the order of the Licensor, five per cent (5%) of all sales of Connectors made hereunder, * * * on or before the twentieth day of the next succeeding calendar month after each quarter during the continuance of this agreement * * * Each quarterly payment is to be accompanied by a verified statement from the Licensee to the Licensor setting forth the number of pieces of each size and type of Connectors sold during the preceding quarter and the net selling prices thereof."

The Thomas & Betts Company, since its organization in 1917, has been engaged

in the manufacture and sale of small electrical specialties and fittings for the installation of electrical work in buildings, including these connecters manufactured under the patent in suit, and bushings.

From March 1, 1932, up to and including the month of October 1937, plaintiff Thomas & Betts Company manufactured and sold approximately 19,613,377 connecters: plaintiff, National Electric Products Corp., has manufactured and sold approximately 6,400,000 connecters, and the licensees of Thomas & Betts Company, during such period as they have been licensed, manufactured and sold approximately 44,353,892 connecters, making a total of 70,377,000; the gross selling price of which is in excess of $1,500,000.

The total number of connecters of all kinds sold throughout the United States during said period does not appear in the evidence, but the defendant Joselson testified that, while the customers who purchased connecters from him did not ordinarily specify the character of connecter desired, approximately 90% of all of the connecters sold by the defendants were of the type manufactured under the patent in suit.

The connecters manufactured and sold by the plaintiff National Electric Products Corporation bore upon each device the word "Patent." The devices manufactured by the plaintiff Thomas & Betts Company were not so marked, but Mr. McMurtrie testified the containers were marked and there is in evidence a label which he stated was affixed to each box of containers bearing the legend "Pat. July 8, 1930, No. 1,769,947." He further testified that he did not know what practice had been followed by the sub-licensees of his company but there was introduced in evidence by the defendants a label showing a cut of a set screw connecter and the words "Made in U. S. The Thomas & Betts Co., Elizabeth, N. J." and the reference "Cat. No. 240 V" but no specific mention of the patent in suit.

It also appears from a list of inspected electrical appliances published (May 19, 1937) by Underwriters Laboratories, Inc., sponsored by National Board of Fire Underwriters, that those of the plaintiff's sub-licensees listed had their own individual markings. Also, that Eastern Tube & Tool Company, Inc., Brooklyn, N. Y., National Electric Products Co., Pittsburgh, Pa., and Walker Bros., Conshohocken, Pa.,

were among some 23 manufacturers of armored cable and that Thomas & Betts Company are among some 15 manufacturers of connecters so listed.

This action was commenced October 5, 1935. It is contended by the defendants that the service of the bill of complaint was the first notice which they ever had of the plaintiffs' claim of their alleged infringement.

Immediately after the service of process, the defendant Joselson visited the office of the plaintiff's attorney and was shown two connecters which, he testified, he recognized as having been made, one by the Steel City Electric Company, and the other by the Chicago Steel Tank, now the Conduits Fittings Corporation (both licensees of the plaintiff), but he was unable to state whether he sold this particular connecter to the jobbers because the manufacturers also sold to the jobbers direct. However, that testimony indicates to the Court that the defendants did not try to excuse the purchase and use of connecters made by Sterling as having been purchased from Steel City and Chicago Steel Tank. Mr. Joselson claims that at the same interview he was told by plaintiffs' attorney that the Sterling license had been cancelled, which, he asserts, was his first knowledge of that fact, and that since that time he has not purchased any connecters of the kind manufactured under the patent from any manufacturer not listed in the bill of complaint as a licensee.

The defendants' answers to interrogatories specify the connecters which the defendants admit having purchased; the defendant Joselson Sales Corporation admits purchases from Sterling in February, March, October, November and December 1933; January, February, March, May, June and July, 1934; from Appleton Electric Company, August, September, October, November and December 1934 and March 1935; from Chicago Steel Tank Company, November and December 1934, and from Steel City Electric Company, April, May and June 1935. Defendant Electrical Fittings Corporation admits purchases from Steel City Electric Company in July, August, September and October, 1935.

Plaintiffs' answers to interrogatories set forth that all of the companies from whom these connecters were purchased were licensed under the patent in suit but that the Sterling license, which was is-

sued February 8, 1932 was cancelled on May 10, 1933. It does not appear when Sterling ceased to manufacture or what stock it had on hand on May 10, 1933.

Moreover, plaintiffs' motion for a bill of particulars contains a waiver of any charge of infringement on any of the connecters the defendants admit buying, except those bought from the Sterling Manufacturing Company by the defendant Joselson Sales Corporation subsequent to May, 1933.

Therefore, in the last analysis, the issue is whether Joselson, or the corporate defendants, purchased connecters from Sterling with reasonable cause to believe that the Sterling license had been cancelled prior thereto.

Upon that issue the Court is not persuaded that the plaintiff has sustained the burden of proof. It may very well be that when the Sterling Company was retiring from business, as the evidence shows that it did, it had on hand a substantial quantity of connecters manufactured under its license and that the defendants stocked up to meet the requirements of customers for a considerable time thereafter. Certainly, there is no claim since July 1934 upon which the Court could base an injunction, although purchases were thereafter made during a period of 15 months prior to the commencement of suit. Infringement there may have been as to purchases from Sterling, but the proof is insufficient to justify a direction for an accounting and the appointment of a Special Master to take proof of damages.

If a more formal compliance with the provisions of Equity Rule 70½, 28 U.S. C.A. following section 723, is desired, submit findings of fact and conclusions of law upon notice of five days.

| CLAIM NO. 1 | FULLMAN | FREDERICKSON | GOEHST | KLEIN | FREEMAN | HINSDILL | GILBERT | APPLETON | WEBSTER | CASPER | PERRY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Armored cable | x | x | x | x | x | | | x | x | | x |
| Bushing | x | x | x | x | x | x | x | x | x | x | x |
| Insulated material | x | x | x | x | x | | | | | | |
| Having tubular position | x | x | x | x | x | | | x | x | x | x |
| Contained within the armor | x | x | | x | x | | | | | | |
| A shoulder | x | | | x | x | | x | x | A x | | x |
| Bearing against end of armor | x | | | x | | | | | A x | | |
| Connecter | x | | x | | | x | x | x | x | B x | x |
| Portion projecting beyond end of armor | x | | x | | | | | x | x | B x | x |
| Inwardly projecting fingers | x | | | | | | | | | B | D |
| Adapted to bear upon bushing shoulder | x | | | | | | | | | B | |
| and retains bushing in place | x | | | | | | | | | B | D |
| Visibility of bushing (not in claim) | x | x | x | x | x | x | x | x | x | x | x |

Key: A. Shoulder is not an integral part of bushing but is a separate element.
B. The extended lugs are not an integral part of the connecter, but are carried thereby and they do not retain bushing in place.
C. Armored cables but no separate conduit.
D. The fingers do not bear upon the bushing but upon the outside plate of the box and they do not retain the bushing in place.

927

| CLAIM NO. 2 | FULLMAN | FREDERICKSON | GOEHST | KLEIN | FREEMAN | HINSDILL | GILBERT | APPLETON | WEBSTER | CASPER | PERRY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | C | | C | C | | | C | C | | C |
| Electrical conduit | x | x | x | x | x | x | x | x | x | x | x |
| Bushing | x | x | x | x | x | x | x | x | x | x | x |
| Tubular position | x | x | x | x | x | x | x | x | x | x | x |
| Within conduit | x | x | | x | x | | | | | | |
| | | | | | | | | | A | | |
| Shoulder | x | | | x | x | | x | x | x | | x |
| | | | | | | | | | A | B | |
| Bearing against end of conduit | x | | | x | | | x | | x | x | |
| Means for securing bushing to conduit | x | | x | x | x | x | x | x | x | x | x |
| | | | | | | | | | | B | |
| Connecter | x | | x | x | x | x | x | x | x | x | x |
| Having means for retaining bushing in place | x | | x | x | x | x | x | x | x | x | x |
| Leaving bushing visible | x | | x | x | x | x | x | x | x | x | x |

Key: A. Shoulder is not an integral part of bushing but is a separate element.
B. The extended lugs are not an integral part of the connecter, but are carried thereby and they do not retain bushing in place.
C. Armored cables but no separate conduit.
D. The fingers do not bear upon the bushing but upon the outside plate of the box and they do not retain the bushing in place.