## HAZELTINE CORPORATION v. CROSLEY CORPORATION.

### No. 9096.

Circuit Court of Appeals, Sixth Circuit.

Aug. 28, 1942.

Laurence B. Dodds and Henry T. Kilburn, both of New York City (Paxton & Seasongood and Robert P. Goldman, all of Cincinnati, Ohio, on the brief), for appellant.

Samuel E. Darby, Jr., of New York City (Allen & Allen, of Cincinnati, Ohio, Floyd H. Crews, of New York City, and Alden D. Redfield, of Cincinnati, Ohio, on the brief), for appellee.

Before ALLEN, MARTIN, and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The bill of complaint charging infringement of MacDonald Patents, Nos. 1,913,604 and 2,022,514, owned by appellant, was dismissed in the district court on the ground that the patents were not infringed. Decision on the issue of the validity of the patent claims was pretermitted.

The patents, relating to vacuum tube radio receivers, describe a wave signaling system; and the invention, as defined by appellant, provides an antenna primary inductance suitable for connection to a capacity antenna, in which the inductance is of such value as to insure resonance of the antenna primary circuit at a frequency below or of the order of the lowest frequency of the tuning band for all usual values or sizes of antennas, the primary inductance being magnetically coupled to the tunable secondary circuit. Appellant relies upon claims 1, 6 and 8 of Patent No. 1,913,604, and upon claims 5, 22, 24 and 25 of Patent No. 2,022,-514, the former patent being a division of the latter.

The claim selected by appellant as typical is No. 1 of the divided patent, No. 1,913,604, which reads: "In combination, a capacitive antenna system containing no lumped inductance, and a radio-frequency system for coupling thereto comprising, a circuit tunable by a condenser throughout a frequency range, a transformer having a secondary coil included in said tunable circuit, and a primary coil electromagnetically coupled to said secondary, said primary coil being adapted for connection to said antenna system and having an inductance insuring resonance of the antenna system at a frequency fixed below said range." Claims 6 and 8 of the same patent, which are substantially similar to Claim 1, are quoted below.[1]

In support of the charge of infringement, appellant relied upon Crosley Radio Receiver Model 519, manufactured and distributed by appellee.

The findings of fact filed by the district court state:

"4. The two patents in suit were allowed by the Patent Office to cover and to be restricted to an antenna primary winding or coil, in a radio receiver, which primary winding itself, without any other connected instrumentalities, is resonant at a frequency below the broadcast band.

"5. The antenna primary coil used by defendant in the accused set is resonant at 850 kilocycles well within the broadcast band which extends from 550 kilocycles to 1500 kilocycles.

"6. It was conceded at the trial by counsel for plaintiff that the accused set does not include an antenna primary winding which itself, without any other connected instrumentalities, is resonant at a frequency below the broadcast band.

"7. It was likewise conceded at the trial by counsel for plaintiff that the patents in suit do not disclose an antenna transformer

[1] "Claim 6. A radio receiving system comprising a plurality of resonant circuits tunable throughout a frequency range, tuning devices therefor having adjustable elements, an antenna system containing no lumped inductance, and means insuring like extents of movement of the adjustable elements of said devices in tuning from resonance at one frequency to resonance at another frequency comprising, a coil adapted for connection to said antenna system, said coil having an inductance insuring resonance of the antenna system at a frequency of the order of the lower limit of said range, said coil serving electromagnetically to couple said antenna system to one of said tunable circuits."

"Claim 8. In a radio-frequency system for coupling to a capacitive antenna, a circuit tunable by a condenser throughout a frequency range, a transformer having a secondary coil included in said tunable circuit and a primary coil adapted to be connected in the antenna circuit, said primary coil having an inductance insuring resonance of the antenna circuit at a frequency of the order of the lower limit of said range and means coupling said primary coil electrostatically to said secondary coil in aiding phase with its electromagnetic coupling thereto."

having a primary winding which itself, without any other connected instrumentalities, is resonant at a frequency below the broadcast band."

At the outset of discussion, a few generalizations may be clarifying. All radio communication is made possible by the transfer of energy in the form of electromagnetic waves. Electromagnetic waves are disturbances in the ether, deliberately created at a radio transmitting station and propagated in all directions through space. The length of an electromagnetic wave is the distance which the wave travels in one cycle. The frequency of the wave is the number of cycles per second.

The first problem of radio reception is to capture the energy in these electromagnetic waves. The fundamental tool employed by the radio designer to that end is a resonant circuit comprising inductance and capacity.

Inductance is that property in an electrical circuit which tends to resist or impede any change in the flow of the electric current. This resistance will increase as the frequency of the current increases. The property of inductance is associated with a wire, usually in the form of a coil. The inductance of a coil depends upon the number of turns, the manner in which the wire is wound, and the material on which it is wound. Capacity serves to store electricity. It is a property associated with two or more spaced electrical conductors, causing the impedance or resistance of the electrical circuit to decrease as the frequency of the current increases. In its effect, capacity is directly opposite to inductance.

When inductance and capacity are associated, a circuit is formed which may be excited by electromagnetic waves. When the frequency of these waves is such that the properties of inductance and capacity in the circuit effectively cancel each other, the circuit becomes resonant. A resonant circuit, excited by a radio signal of the same frequency as the resonant frequency, can amplify the radio signal to a strong oscillatory voltage capable of further amplification in succeeding parts of the receiver.

The natural period of resonance or vibration of each circuit depends upon the amount of its inductance and capacity. By adjusting the value of either inductance or capacity so that the natural period of oscillation of a circuit is the same as that of the oscillating current to be received, any circuit containing inductance and capacity may receive currents of one particular frequency and reject those of all other frequencies. A circuit containing both inductance and capacity variable in value is termed a "tuned circuit"; and receivers employing tuned radio frequency circuits with amplifying vacuum tubes electrically connected in series became known as "Tuned Radio Frequency," or "TRF" receivers.

The TRF receiver possessed essentially one or more amplifiers of high frequency currents, a vacuum tube detector and one or more vacuum tube amplifiers of low frequency currents. The vacuum tubes were glass bulbs which contained three separated electrodes, consisting of a filament and a plate, with a grid shaped metallic member placed in the space between them. The grid electrode constituted one terminal of the tuned input circuit of the tube, and the plate electrode constituted one terminal of the output circuit. The filament electrode was common to both input and output circuits of the tube. But TRF receivers were found deficient for the reason that the vacuous space within the tube between the grid and plate electrodes constituted a "coupling" between the input and the output circuit, causing oscillating current to be fed back from the output of the tube through the coupling into the input circuit, with resultant discordant noises. This tendency of radio frequency amplifiers to "break into oscillations" was cured by an invention of Professor Hazeltine. Hazeltine's invention, which became known as a "neutrodyne radio receiver," neutralized the coupling between the plate and grid electrodes within the tube by means of a circuit external to it.

The validity of the Hazeltine Neutrodyne patents was established by litigation, and practically all manufacturers of marketable receivers paid tribute thereto by becoming licensees under the appellant Hazeltine Corporation, which was created to acquire and hold ownership of the Hazeltine patents. The appellee corporation, which was among the first manufacturers and distributors of radio and broadcast receivers, became a licensee of appellant and remained such until June 30, 1939.

After widespread usage, the Hazeltine Neutrodyne receiver was ultimately rendered obsolete by the development of the "screened grid vacuum tube amplifier," which eliminated the coupling effect within the tube.

In order to comprehend the problem which confronted the inventor, MacDonald, it will be necessary to consider the function of antennas, which are merely devices for radiating the energy of electromagnetic currents into space from a sending station, and for intercepting such energy at the receiving station. Having intercepted high frequency radio waves transmitted through the air, the further function of an antenna at the receiving station is to apply the waves to the input circuit of the radio receiver where they can be selected and amplified. The patents in suit are directed to the circuit associated with the antenna for applying the intercepted radio signals to the radio receiver proper.

Coupling transformers comprised of primary coils of a very few turns and quite low inductance had been customarily used prior to MacDonald's invention. As a result, the antenna circuit was resonant with the usual antenna at a frequency above the tuning range of the receiver. This condition naturally reflected capacity into the first tuning circuit, causing a detuning effect, since the first circuit would be tuned to a different frequency from that of the other circuits. If the inductance of the antenna circuit was increased to an extent that the circuit became resonant within the tuning range of the receiver, the detuning effect was increased. The other tunable circuits being essentially capacitive, the receiver tended to offer less resistance or impedance at high frequencies, making the problem of amplification at the low end of the tuning range more acute. The radio designer thus faced the horns of a dilemma. If he attempted a maximum of amplification, he must couple the antenna circuit closely with the first tunable circuit, increasing the detuning effect at high frequencies. If, on the other hand, he coupled the antenna circuit loosely in an attempt to reduce the detuning effect in the first circuit, amplification would be seriously reduced at low frequencies.

Appellant contends that MacDonald solved these difficulties by revelation of a practicable inventive concept in his patents. Substantially, all that MacDonald appears to have done mechanically, however, was to increase the number of turns on the primary coil of the antenna circuit from some five to slightly more than a hundred. The result of this increased winding was to change the antenna circuit from capacitive to inductive, making the circuit resonant below the tun-

ing range or broadcast band. The broadcast band of receivers ranges from approximately 550 to 1500 kilocycles. MacDonald claimed that he had devised an antenna system inductively reactive throughout the range of the broadcast band.

MacDonald asserted that the use of an antenna circuit having an inductive instead of capacitive reactance substantially throughout the range of predetermined operating frequencies would result in two outstanding advantages: (1) a decidedly more uniform effectiveness with which waves of widely differing frequencies are received, and (2) a radical diminution of the influence exercised by the antenna circuit upon the mutual resonance of the tunable circuit as compared with the influence in that respect of a capacitive antenna circuit.

Other features of the MacDonald patent, claimed as adjuncts to the high inductance primary, were the use of "compound coupling" and "gang" or uni-control. Both these features, however, were old; the first having been revealed in the prior art by Trube Patent No. 2,111,483, and the second by Professor Hazeltine and others.

Appellee insists that the patents issued MacDonald were for an invention wholly different from that now asserted by appellant; and that the patent office refused MacDonald a patent for the invention now asserted by appellant, in which ruling the inventor, MacDonald, acquiesced. Appellee points to the file history of the MacDonald patents in the United States Patent Office as establishing that the MacDonald patents were issued specifically for the use of an inductance coil in an antenna circuit, which coil in itself has a value of inductance giving it a natural period of resonance below 550 kilocycles, the low range of the broadcast band.

In an interference proceeding in the United States Patent Office involving the parent MacDonald application (Miller v. MacDonald, Interference No. 63,834), the examiner found that Radio News for April, 1925, disclosed that an inductance in an antenna circuit may be the aerial alone, or the aerial and the primary coil of the antenna circuit; and that certain of MacDonald's counts did not positively recite an inductance, *as an element separate and distinct from an antenna*, to insure the antenna circuit's showing inductive reactance throughout the received wave-length range. The examiner cited, also, as anticipatory disclosure, a paragraph

entitled "Keeping the Antenna Out of the Argument" in an article published in "Q.S. T.," for November, 1924, and Professor Morecroft's "Principles of Radio Communication," teaching that a loading coil may be employed to increase the natural wave length of an antenna.

He concluded that, even so narrowly construing the counts as to require some means besides the antenna, per se, to insure that the natural wave length of the antenna circuit shall remain above the longest receivable wave length, the claims were not allowable over the disclosure of the Radio News of April, 1925.

The examiner added: "This statement does not mean that invention is not present in so constructing a loading coil for an antenna circuit that regardless of the size of antenna used the antenna circuit is inductively reactive for the longest receivable wave, but does mean that for a specific circuit, for example as shown by Fig. 4 of the Radio News for April, 1925, no invention would reside in (1) making the antenna of such dimensions that the antenna circuit was inductively reactive for all wave lengths to be received or (2) having a given antenna which was insufficient to provide an inductive reaction at the longer wave length, adding thereto a loading coil to obtain said characteristic."

Certain other MacDonald counts were deemed unpatentable over the previously discussed disclosures and over the disclosure of "Q. S. T." for July, 1923, for the reason that, in view of their teachings, no invention appeared to be involved in changing the natural frequency of the antenna circuit employed in the receiver disclosed in "Q. S. T." for July, 1923, from a wave length below the received range to a wave length above it.

The examiner found one of the counts, No. 4, patentable over any recorded prior art, taken alone or in proper combinations thereof; because, he stated, somewhat dubiously: "None of the prior art references disclose 'an inductance in said antenna for tuning it to a wave length higher than the highest wave length of the tuning range of said receiver, *said inductance* having *its* resonant period outside said range'; *and it is not obvious that this is not an inventive improvement over the prior art."* (Italics ours.)

The decision of the examiner would seem clearly to restrict the invention disclosed in the MacDonald patents to the use of a primary coil which, itself, is resonant below the band. He found no invention in either lengthening the antenna or increasing the number of turns on the coil, in order to make the antenna circuit as a whole resonant below the band.

It has been admitted by appellant and its expert witnesses that in the accused radio receiver of appellee the inductance coil in the antenna circuit is 850 kilocycles, which is well within the broadcast band.

Appellant conceded, also, that no mention is made of a Superhetrodyne Receiver in the patents in suit. Although the inventor, MacDonald, testified that he was thoroughly familiar with the Superhetrodyne type of receiver, and had assisted in constructing the first such receiver, his patents in suit were shown and described as related to a tuned radio frequency (TRF) system.

The accused device, Crosley Model No. 519, is a *Superhetrodyne* receiver. The dilemma of detuning or unsatisfactory amplification is non-existent with respect to Superhetrodyne receivers, for the reason that the use of an oscillator-modulator tube and subsequent fixed-tuned circuits at intermediate radio frequencies solved the problem of amplification at all frequencies.

Infringement is a question of fact. Stilz v. United States, 269 U.S. 144, 147, 46 S.Ct. 37, 70 L.Ed. 202. Much weight should be attached, in determining that issue, to the findings and opinion of the trial judge, who observed the manner and demeanor of the witnesses on the stand and heard them testify. La Bour v. Gorman-Rupp Co., 6 Cir., 108 F.2d 279. See, also, Williams Mfg. Co. v. United Shoe Mach. Corporation, 6 Cir., 121 F.2d 273, 276, 277.

The district judge summarized decisively in the concluding portion of his opinion (39 F.Supp. 775, 776, 777): "Because of the Patent Office decision and particularly the restriction limiting the patents to a system including 'a coil in said antenna circuit of a value, * * *' and plaintiff's stipulation (R. 309): 'We are willing to concede that that set (Pl. Ex. 4-Def.'s Accused Set) does not include an antenna primary winding which itself, without any other connected instrumentalities, is resonant below the band, and that the patent does not disclose an antenna transformer having a primary winding of such character,' this court has no alternative but to find as a mat-

ter of fact that plaintiff has failed to sustain the burden of proof on the issue of infringement, and concludes as a matter of law that defendant is entitled to judgment on that issue."

We consider this analysis sound in reasoning and based upon the evidence in the case. The bill of complaint was, therefore, properly dismissed.

The record discloses, however, that no opinion was expressed, no findings of fact were filed, and no conclusions of law were stated by the district court with respect to the validity of the patent claims in issue. Nevertheless, the appellant urges that this court should pass upon the validity of the claims of the MacDonald patents. We cannot agree that such procedure would be appropriate.

In Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L. Ed. 1263, a case was presented where the district court had decreed a patent claim valid but not infringed. Instead of dismissing the bill without more, the district court, Thomas & Betts Co. v. Electrical Fittings Corp., 23 F.Supp. 920, had entered a decree adjudging the claim valid, but dismissing the bill because infringement had not been proved. An appeal, taken by the defendant from so much of the decree as adjudicated validity, was dismissed by the Circuit Court of Appeals for the Second Circuit, Id., 100 F.2d 403, because that court considered the decree not binding against the appellant in any subsequent suit on the issue of validity. The Supreme Court, however, reversed the judgment of the Court of Appeals, remanded the cause with instructions that the appeal be entertained and that the district court be directed to reform the decree by eliminating that portion determining validity of the patent claim.

In the instant case, the district court, evidently mindful of the authority just cited, made no ruling upon the validity of the patents after non-infringement had been determined. Had the district court been under obligation to proceed further and to decide the question of validity, it is assumed that the district court, pursuant to Federal Rules of Civil Procedure, rule 52, 28 U.S. C.A. following section 723c, would have found the facts specially upon that issue, and would have stated separately its conclusions of law thereon; whereupon, on appeal, this court in duty bound would have applied the mandate of the rule that "find-ings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

In patent cases where the testimony of expert witnesses is sharply at variance as in the case at bar, it is essential that the reviewing court should have the benefit of findings of fact of the trial judge, who had the opportunity not afforded the appellate court of judging the credibility of the witnesses. In this connection, the mere fact that the subject matter of patent litigation is scientific creates no logical differentiation between such litigation and mill-run civil actions. Without findings of fact from the trial court, the reviewing court would, in our judgment, violate both the letter and the spirit of Rule 52 in passing upon a controverted issue of fact [in the instant case the validity of a patent] not determined in the trial court.

Appellant cites Mills Novelty Company v. Monarch Tool & Mfg. Co., 6 Cir., 49 F.2d 28, holding that appeals in equity bring up the whole case and that the decree below should be sustained, if right for any reason. The authority lends no support to appellant's insistence that the validity of the patents should be adjudicated in the instant case; for the district court in the case cited had adjudicated one of the patents invalid for want of invention, and the other valid and infringed.

Likewise, in Paine & Williams Co. v. Baldwin Rubber Co., 6 Cir., 113 F.2d 840, cited by appellant, the district court held the patent claims invalid; and this court affirmed the decree upon that issue. Before passing upon the question of validity of the patent, the court deemed it necessary to consider the effect of the judgment in a former case involving a license to use the patent, and held that affirmance of the trial court's judgment in favor of the owner of the patents did not evince approval by the circuit court of appeals of the district court's conclusion on questions of novelty and invention. It was said (113 F.2d 844): "We have repeatedly held that if the judgment of the lower court is correct for any reason, it will be affirmed, however erroneous the basis of or the reason for the lower court's judgment."

Appellant has cited the opinion of this court in Aluminum Co. of America v. Thompson Products, Inc., 6 Cir., 122 F.2d 796, but has overlooked the comment with

respect to that case, made in American Seating Co. v. Ideal Seating Co., 6 Cir., 124 F.2d 70, 72: "More matured consideration leads to the conclusion that we are not obliged to adjudicate validity in behalf of one not guilty of infringement who has appealed."

■ The converse of this proposition is equally true. We are not obliged to adjudicate validity in behalf of the owner of a patent who has appealed from a decree adjudicating non-infringement. An adjudication upon the validity of the patent would be as moot in the one case as in the other. In the American Seating Company case, the district court had assumed but did not adjudicate the validity of the patent. In the instant case, the district court neither assumed nor adjudicated validity or invalidity, but pretermitted that question as moot.

The importance of findings of fact by trial tribunals has been constantly stressed in modern jurisprudence. Moreover, emphasis has been placed upon the binding effect of concurrent findings of a trial and a reviewing tribunal, where there is evidence to support the concurrent findings. In Aluminum Company of America v. Thompson Products Co., supra, this court said (122 F.2d 799): "The question of infringement is one of fact and the concurrent findings of non-infringement by both court and master are not lightly to be rejected."

In Williams Manufacturing Co., v. United Shoe Machinery Corporation, 6 Cir., 121 F.2d 273, we affirmed the decree of a district court holding patent claims valid and infringed. In an opinion affirming our judgment, 62 S.Ct. 1179, 1181, 86 L.Ed. —, decided May 25, 1942, the Supreme Court said: "These findings are to the effect that the new combinations, while they involve old mechanical constructions, combine these in a new way so as to produce an improved result. These are findings of fact, despite the petitioner's apparent contention to the contrary, *and we will not disturb such concurrent findings where, as here, there is evidence to support them."* (Italics ours.)

Inasmuch as concurrent findings of fact of a district court and a circuit court of appeals in patent cases are considered by the Supreme Court to be of such consequential importance, it would seem idle to argue that a circuit court of appeals should decide an issue immaterial to support the final decree of a district court, where the latter has made no findings and intimated no opinion upon an issue immaterial from the standpoint of the ground upon which the decision was based.

No adjudication will be made, therefore, by this reviewing court upon the issue of validity of the claims of the MacDonald patents.

The decree of the district court, adjudicating noninfringement and dismissing the bill of complaint, is affirmed.