### HALE v. GENERAL MOTORS CORPORATION.

### No. 4008.

Circuit Court of Appeals, First Circuit.

Feb. 16, 1945.

---

Harry T. Talty, of Boston, Mass., for appellant.

Drury W. Cooper and C. B. Townsend, both of New York City (Cooper, Kerr & Dunham, of New York City, and Richard F. Walker and Roberts, Cushman & Grover, all of Boston, Mass., of counsel), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a final judgment of the District Court of the United States for the District of Massachusetts dismissing a complaint in an action for patent infringement. In the complaint the defendant is charged with infringing two patents issued to and owned by the plaintiff, but at the outset of the trial in the court below the plaintiff consented to a decree dismissing his complaint on the merits and with prejudice as to his earlier patent (No. 2,140,155) and the action proceeded with respect to his later one only (No. 2,-186,334) six claims of which were involved, Nos. 16, 19, 21, 23, 24 and 36. The learned district court wrote no memorandum opinion but made detailed and erudite findings of fact as a result of which it concluded that the defendant had not infringed any of the claims in suit. It made no findings and reached no conclusions on the issue of their validity.

The patent before us was applied for on June 18, 1934, and issued on January 9, 1940. It is for an improvement in change speed systems, more specifically, for what may be called an automatic change speed transmission for use in automobiles.

From the earliest days of automobiles powered by internal combustion engines some device, ordinarily called a transmission, has been used to provide reduction gearing between the engine and the drive shaft to permit the engine to revolve relatively rapidly, and so develop more power, while the rear wheels are turning comparatively slowly.[1] Ordinarily in the past, and in most automobiles now in use, the gears in the transmission are shifted from ratio to ratio at the will of the operator by means of a clutch operated by the left foot and a hand operated gear-shift lever.[2] For a great many years, however—the evidence is since 1908—efforts have been made to devise a satisfactory means for shifting gears automatically. Only very

---

[1] The desirability, if not the practical necessity, of such a device was well stated by the defendant's expert witness who said:

"A transmission is needed in an automobile using an internal combustion engine because there is a very definite limit to the amount of turning force or torque that the engine can develop. Our modern engines will supply a uniform turning force, or a fairly uniform turning force for quite a speed range, but they will give nothing at all at zero speed, so that we have to have some disconnecting device which can be a clutch, and in the ordinary gear box involves a demeshing of the gears and a disconnection. If we made the engine large enough so that it would pull the car up the steepest grade that we have to climb after it was once connected to the rear axle, we would have a very inefficient device and a very heavy power plant, because we would have to have engine enough available for the steepest hill we would want to climb. If we use a smaller engine and can arrange to gear that engine to the rear axle at two or three different ratios, then that smaller engine can be used, and that has been the practice since the very first automobile, to the best of my knowledge. I don't believe I ever saw an automobile that was supposed to have been run on the road that did not have a plurality of ratios."

[2] The principal exceptions are Model T Fords, not manufactured since 1926, which had a planetary type transmission as to which see Des Rosiers v. Ford Motor Co., 1 Cir., 143 F.2d 907, 908, and recent model Oldsmobile and Cadillac cars equipped with the defendant's transmission which will be described hereafter.

recently has any measure of practical success been attained.

The reason for the difficulty in achieving automatic shifting is that gear ratios cannot by any means always be changed at predetermined vehicle speeds. For instance on a paved, dry, level highway in the country it might be best to shift from first into second at five miles per hour and from second into high at ten miles per hour, but on a hill, in traffic, in mud, snow or deep sand, or with a heavily loaded vehicle, it may be essential to delay shifting until higher speeds, say of ten and twenty miles per hour respectively, have been attained. In the case at bar we are concerned with the problem of delaying the action of an automatic transmission as circumstances require.

To solve this problem the plaintiff shows a transmission consisting of a gear box containing a multiplicity of gears, shafts, and one and two-way clutches, the important characteristic of which so far as we are concerned here is that gears are shifted by the axial movement within the gear box of what is referred to as a pressure plate. As this plate is pushed forward the gears shift upward, that is, from first into second, and then, on further pressure, from second into high, and as pressure upon the plate is released and it is allowed to move to the rear under the influence of a return spring, the gears shift downward in the same progression.[3] The plaintiff derives the force necessary to push his pressure plate forward for the upshift from a mechanical governor, basically of the fly-ball type, geared to revolve with and around the output shaft of the transmission (the extension inside the transmission of the drive shaft of the automobile) and so arranged that arms attached to it bear directly on the pressure plate. Thus when the motor of an automobile equipped with the plaintiff's device is started with the main clutch disengaged the governor does not move but remains held in its static position by the usual spring found in governors of this type, in this instance, a coil spring around the output shaft. But as soon as the main clutch is engaged and the automobile starts to move forward (apparently the plaintiff's transmission is in low gear when at rest) the governor weights move outward by centrifugal force thereby compressing the spring just mentioned and exerting a pressure through the governor arms on the pressure plate tending to force it forward against the force of its return spring. As vehicle speed is increased the force exerted by the governor increases and, overcoming the resistance of the two springs opposed to it (its own control spring and the pressure plate return spring) it pushes the pressure plate forward thereby shifting the gears upward from first into second and then on into high speed as the road speed of the vehicle builds up.

So far as described the plaintiff's device would always shift gears at predetermined vehicle speeds and in consequence it would be wholly impractical in an automobile. Realizing this the plaintiff provides automatic means for delaying the action of the governor, and in consequence the upshift of gears in the transmission, whenever road conditions require or the driver wishes to shift at higher than normal vehicle speeds. It is with this means, and the means provided by the defendant to accomplish the same purpose in its "Hydra-Matic"[4] transmission, that we are here primarily and directly concerned.

The plaintiff's conception was to increase the tension of the governor control spring —the coil spring around the output shaft of the transmission which pushes mechanically against the centrifugal force of the governor weights—whenever during the shifting operation the accelerator is depressed relatively far with relation to the speed of the vehicle. His device consists of a linkage attached to the accelerator pedal by which when the vehicle is moving slowly but the accelerator is depressed more than normally, a valve is opened permitting oil under pressure, as from the engine oil pump, to pass into a horizontal cylinder behind a piston. The axis of this cylinder and piston is at a right angle to

---

[3] Downward shifting to obtain greater braking effect from the engine whenever appropriate is provided for in both the plaintiff's and defendant's devices but for the purposes of this opinion we do not need to concern ourselves with this feature and so we shall not discuss it in detail.

[4] This transmission was used on some of the defendant's later model Oldsmobile and Cadillac cars and we are told that it is now used extensively in tanks and some other military vehicles and will be used again for passenger cars when manufacture of such vehicles is resumed.

the axis of the transmission and as the piston moves over in the cylinder under the influence of the oil under pressure, it carries a toothed rack in engagement with a pinion gear in the form of a nut threaded onto a hub projecting inwardly around the hole in the gear box through which the output shaft extends and consequently behind the governor control spring. In this way the pinion gear or nut is screwed up to tighten or increase the tension of the spring against which the governor is exerting some of its force thereby delaying the action of the governor. To summarize, in the plaintiff's device gears are shifted automatically by direct mechanical pressure exerted by a governor on a pressure plate, the governor being under the control of a spring, the tension upon which is increased and governor action in consequence delayed whenever during shifting the accelerator is depressed further than usual for the speed at which the vehicle is moving.

The defendant's device accomplishes the same result as the plaintiff's in that it delays upward shifting of gears whenever during that operation pressure on the accelerator is disproportionate to the speed of the vehicle, and to do this it employs oil under pressure and a governor driven from the output shaft of the transmission. But it does not use these effectuating means in at all the same way that the plaintiff does. It has a transmission consisting of a gear box containing two planetary units arranged in series. These units have different gear reduction ratios so that by their selective operation four forward speeds may be produced, low speed when both units are driving in reduction, second speed when the rear unit is in reduction and the forward unit is in direct, third speed when the front unit is in reduction and the rear unit in direct, and fourth speed when both units are driving in direct.

Planetary gear units are very old and well known in the automobile art.[5] They have three principal geared elements: a central gear, called a "sun" gear through which ordinarily power is transmitted to the unit; a larger internal gear, that is, a gear having its teeth arranged around the inside instead of around the outside of its rim, called a "ring" gear; and intermediate small pinion gears of any desired number in mesh with the "sun" and "ring" gears and freely rotatable on spindles at-

tached to a circular plate on the end of the output shaft of the unit. These latter gears are called "planet" or "planetary" gears because they revolve around the "sun" gear when the "ring" gear is held against rotation. The characteristic of these units is that when the "ring" gear is held, as by a brake, the unit will drive in reduction, and when the brake is released and the "sun" gear locked to the plate on the end of the shaft which carries the "planet" gears, as by a clutch, the whole unit will revolve and in consequence give direct drive. Thus each planetary unit in the defendant's transmission is equipped with a brake to drive it in reduction and a clutch to drive it in direct, and it is by the appropriate engagement and disengagement of these brakes and clutches that gears are shifted upward and downward. To operate these brakes and clutches the defendant uses what are called "servos" which are merely small motors, in this case cylinders and pistons using oil under pressure comparable to the cylinder and piston used by the plaintiff in his device. Servos of this type have been commonly used for many years as a substitute for manual operation when more power is needed than can conveniently be supplied by hand.

We turn now to the heart of the defendant's device; the valves which control the oil under pressure by means of which these servos are operated.

The oil pressure required to operate the defendant's transmission is supplied by two oil pumps, each capable of producing eighty pounds pressure, connected in parallel so that they supplement one another. One of these pumps is operated by the automobile motor and the other by the automobile drive shaft, so that full oil pressure is available to operate the servos whenever either the motor is running or the automobile is in motion. This oil pressure is metered, or variably reduced, by two valves, one a governor driven by the drive shaft and the other a sliding valve called a "throttle" valve because it is operated in conjunction with the accelerator. The pressure from these valves oppose, and to a certain extent balance one another, in a complex device consisting of three so called shifter valves located side by side in a single casting attached to the outside of the gear box proper. Leaving out unnecessary and complicating details these

---

[5] See footnote 2, supra.

valves may be described as each consisting of a cylinder with a piston inside it, the piston "biased" or held at one end of its stroke by a coil spring. These springs are of different tension, the lightest tension being applied to the shifter valve controlling the shift from first into second speed, and the greatest tension being applied to the shifter valve controlling the shift from third into fourth speed. Oil under pressure as metered by the governor is admitted through pipes into the valve casting at the heads of the pistons thereby tending to push them over against the force of their several springs, and oil under pressure as metered by the throttle valve is admitted behind regulator plugs which we need not describe except to say that they are positioned behind each piston and when under oil pressure support or supplement the biasing springs.

As a result of this mechanism when the vehicle begins to move the governor begins to revolve delivering oil pressure to the shifter valve, and as vehicle speed increases and governor pressure consequently rises, a point is reached at which the metered governor pressure overcomes the force of the metered throttle pressure supporting the weakest biasing spring. When this occurs the 1-2 shifter valve moves and as soon as this happens, by a mechanism we need not describe, it is suddenly flipped over into its completely open position without disturbing either of the other shifter valves at all. This sudden opening of the 1-2 shifter valve uncovers a port permitting the full eighty-pound oil pressure to flow through appropriate pipes to the servo operating the brake and clutch to accomplish the shift from first into second. Then as the speed of the vehicle increases further and in consequence governor pressure rises, a point is reached at which the 2-3 shifter valve is similarly operated and the shift from second into third speed is accomplished. At a still higher vehicle speed similar action occurs effecting the shift from third into fourth or highest speed. With this system when the accelerator is depressed the "throttle" valve is opened to deliver oil to the regulator plugs under higher pressure. Thus if pressure on the accelerator during shifting is great relative to the speed of the vehicle, more governor pressure will be required to overcome an increased pressure delivered by the throttle valve so that, governor pressure being dependent upon governor speed and governor speed upon vehicle speed, upward shifting will be delayed to higher vehicle speeds. In other words, the shifter valves normally are closed and stay closed until governor pressure overcomes throttle valve and biasing spring pressure combined, an event which occurs with rising speed of the car but is delayed by increased throttle opening. Thus to delay any given upshift it is only necessary to press harder on the accelerator which not only opens the "throttle" valve further, but also demands more from the motor and so has the car moving faster before the upshift can take place.

From the foregoing description of the plaintiff's and the defendant's devices it is hoped that their points of similarity and their differences will be apparent. To summarize, however, it may be said that Hale shows a direct acting mechanical governor which itself, without the interposition of intermediate elements, effects gear shifting but is controlled by a spring, the tension of which is increased by means of a servo operated by oil pressure whenever foot pressure on the accelerator pedal is disproportionate to the speed of the vehicle; whereas in the defendant's mechanism the governor does not itself shift gears but instead measures or meters out oil pressure proportional to the speed of the car, which, when it over-balances the force of a spring plus an oil pressure metered out by a valve operated in connection with the accelerator, actuates valves which control oil pressure servos in the transmission which effect the actual gear shifting operation. Thus, although the two devices perform the same function, i. e. shift gears automatically but delay shifting when there is excessive foot pressure on the accelerator, it is evident that they do not perform this function in substantially the same way.

Nevertheless the plaintiff takes the position that the defendant's device infringes for the reason, he says, that both he and the defendant effect gear shifting by the use of a governor driven by the drive shaft of the automobile, the force of which is resiliently opposed and to an extent dominated by means of devices utilizing oil under pressure metered through a valve controlled coincidentally by the operator when he controls the accelerator of the vehicle. We concede substance to what the plaintiff says, but in view of the wording of the plaintiff's patent we cannot adopt

his contention that infringement is thereby indicated.

■ As already appears the plaintiff's and the defendant's structures are not only entirely different in design but they also operate on radically different principles. In the plaintiff's device gears are shifted by the direct mechanical action of a drive-shaft-governor the operative force, or output, of which is variably reduced by an adjustable spring which forms an integral part of the governor itself, whereas in the defendant's device gears are shifted by servos actuated by oil under eighty pounds pressure delivered from oil pumps but diverted or shunted from one shifting mechanism to another in part only by the indirect action of a drive-shaft-governor the output of which is not reduced, but instead is variably opposed by combined oil and spring pressure in a device not part of the governor itself. Turning to the plaintiff's patent with this in mind, it seems to us evident that the plaintiff took pains to distinguish the defendant's principle of operation from his own when he said in his specification: "One of the improvements to be noted at the outset in my present invention is that the governor effects gear shifting and is itself dominated, for example, by fluid pressure. * * * whereas in prior units the governor dominated the fluid or electric controls which effected change in the gear ratio." And furthermore, and this is conclusive, the defendant's principle of operation is not covered by the claims in suit which specify "in an automatic change speed transmission [system] having a speed governor effecting [gear] ratio changes" and either "a member" or "a means" "adapted to dominate" the governor. Nor is the defendant's principle of operation covered by the last claim in suit, the only one which does not contain the phrases just quoted, but instead specifies "means responsive to the speed of said driven shaft to control ratio changes" and "means to resiliently oppose the action of said speed responsive means." This is broader language, but viewed in the light of the drawings and of the statement quoted above from the specification, it is not to be read as broad enough to cover the defendant's principle. We conclude therefore that the plaintiff is limited to his own principle of operation, and a narrow range of equivalents, his patent being admittedly a paper one, and in consequence we are of the view that the district court correctly held that the defendant's device does not infringe any of the claims in suit.

One further matter, however, remains for consideration.

The defendant submits that the plaintiff's patent is clearly invalid for both anticipation and inoperativeness and that, notwithstanding the absence of infringement, we should so declare it "and thereby cut off the plaintiff's right to bring another suit against a variant of defendant's present construction; and, also, the right to sue the Government in the Court of Claims, on account of its use of the Hydra-Matic transmission for tanks and other vehicles in the war."

The Supreme Court in the recent case of Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450, said: "To hold a patent valid if it is not infringed is to decide a hypothetical case," and logically it would seem that to hold a patent invalid if it is not infringed would be to decide an equally hypothetical case. Nevertheless there is good authority for holding invalidity in spite of non-infringement, in order, as Judge Learned Hand pithily said in Bresnick v. United States Vitamin Corp., 2 Cir., 139 F.2d 239, 242, that the patent "should not remain in the art as a scarecrow." See also Cover v. Schwartz, 2 Cir., 133 F.2d 541, 545. But, however this may be, the present case does not seem to us an appropriate one in which to decide this point.

■ As is evident from this opinion the device patented by the plaintiff is exceedingly complex, and the prior art patents relied upon as anticipatory are little if any simpler. Furthermore, the complexity of the plaintiff's device makes it exceedingly difficult for us to pass intelligently upon the defendant's argument that it is inoperative. Under these circumstances, and in view of the fact that at the trial below the principal emphasis was on the issue of infringement and the district court requested briefs and made findings on that issue only, we feel that even though we may have power to declare the plaintiff's patent invalid, in discretion we ought not to do so here. Hazeltine Corp. v. Crosley Corp., 6 Cir., 130 F.2d 344, 349; Landis Machinery Co. v. Chaso Tool Co., Inc., 6 Cir., 141 F.2d 800, 805.

The judgment of the District Court is affirmed, with costs to the appellee.