## UNION SWITCH & SIGNAL CO. v. KODEL ELECTRIC & MANUFACTURING CO.

## KODEL ELECTRIC & MANUFACTURING CO. v. UNION SWITCH & SIGNAL CO.

### Nos. 5789, 5790.

Circuit Court of Appeals, Sixth Circuit.

Jan. 7, 1932.

Charles Neave, of New York City (Henry R. Ashton, of New York City, and John B.

Hollister, of Cincinnati, Ohio, on the brief), for Union Switch & Signal Co.

S. E. Darby, Jr., of New York City, and Thomas G. Haight, of Jersey City, N. J. (Arthur H. Ewald, Allen & Allen, and Marston Allen, all of Cincinnati, Ohio, on the brief), for Kodel Electric & Manufacturing Co.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

MOORMAN, Circuit Judge.

This is a suit for infringement of the Grondahl patent, No. 1,640,335, for an "unidirectional current-carrying device." The plaintiffs are Union Switch & Signal Company, the owner of the patent, and Westinghouse Electric & Manufacturing Company. The Westinghouse Company and General Electric Company are licensees in the field in which the defendant operates. The defendant is the Kodel Electric & Manufacturing Company, which is engaged in manufacturing and selling, among other things, electric current rectifiers. On the trial below the court held claims 10 to 14, inclusive, valid and infringed, and granted the plaintiffs an injunction and an accounting for profits and damages, but held claims 1, 2, and 7, and 15 to 20, inclusive, invalid. The defendant appeals from the decision on the first group of claims, and the plaintiffs appeal from the decision on the others.

The patent relates to an electric current-carrying device which has relatively high conductivity in one direction and relatively low conductivity in the opposite direction. It converts alternating currents into direct currents and is commonly used where a direct current is needed and an alternating current is alone available. The effective unit of the device consists of a copper disc or plate having cuprous oxide formed on one side thereof by the heating of the disc on that side to a temperature of about one thousand degrees centigrade. The specifications state that at the juncture of the metal compound with the copper there is "a permanent set-up of particles permitting a relatively free flow of electrons in the direction from the copper to the cuprous oxide, while obstructing the flow of electrons in the opposite direction." It is the position of the plaintiffs that the copper plate with the cuprous oxide formed thereon in and of itself constitutes the invention. Claims 1 and 2 call for "copper having cuprous oxide formed thereon, said combination constituting in and of itself a uni-directional current carrying device." Claim 7 is not limited to a copper plate, but calls for "a metal having formed thereon a compound which conducts current electronically." Claims 10 to 14 call in varying diction for a copper member or plate constituting the cathode of the rectifier with cuprous oxide integrally united thereto over a relatively extended area, the junction there-between being utilized to pass current in the direction from the copper to the oxide more freely than in the reverse direction. Claims 15 to 20, inclusive, call for two dissimilar bilaterally conducting bodies integrally joined to each other, the junction between the two constituting a unidirectional current valve permitting substantially free flow of electrons only in one direction. We print in the margin claims 12 and 16 as representative of their respective groups.[1]

Applications for the patent were filed both in this country and Great Britain in 1922. The application filed in this country was in the name of Grondahl and Nicholson. In October of 1923 the British patent, No. 194,653, was issued and sealed. In April, 1924, application was made to the Patent Office, supported by affidavits of Grondahl and Nicholson, to strike out the name of Nicholson on the application filed in this country on the ground that Grondahl was the sole inventor. Subsequently, January 7, 1925, Grondahl filed an application in his own name, claiming that it was a continuation of the original application, and asking that it be given the original filing date. The Patent Office issued the patent on this application, holding that Grondahl was the inventor, and that the effective date of his application was the date of the earlier joint application. Appellant insists that this ruling was contrary to American Casting Machine Co. v. Pittsburgh Coal Washer Co. (C. C. A.) 237 F. 590, 601. But in that case the joint application "was abandoned" and the sole application was "a hostile and independent ap-

---

[1] "12. In a rectifier device, a copper plate constituting the cathode of the rectifier, a solid layer of cuprous oxide integrally formed over a relatively extended portion of the surface of said plate, the junction between said bodies being utilized to permit a relatively free flow of electrons from the copper to the oxide while obstructing electron flow in opposite direction under substantial absence of electrolytic or chemical changes in the portions near said junction."

"16. In a rectifying device, two dissimilar bi-laterally conducting bodies integrally joined to each other over an extended area, the junction between said two bodies constituting a uni-directional current valve permitting substantially free electron flow only in one direction thereacross under substantial absence of electrolytic or chemical changes in the portions of the two bodies adjacent to said junction, the conductivity of one of said bodies being relatively low as compared to the conductivity of the other of said bodies."

plication, standing on its own ground." The case at bar is different. Here Grondahl sought to correct a mistake in the joint application, claiming that he was the sole inventor and that his application was entitled to the filing date of the earlier application. We think the Patent Office was justified in holding that the application was a continuation of the original application and that Grondahl was the sole inventor. In re Roberts, 49 App. D. C. 250, 263 F. 646; Bijur v. Kennington, 51 App. D. C. 230, 278 F. 313, and Briggs v. Kaisling, 53 App. D. C. 49, 288 F. 254.

■ It is sufficient to say as to the patent disclosures that one skilled in the art could easily construct the Grondahl device by a study of the patent specifications; certainly they quite definitely disclose a copper plate with a coating of cuprous oxide integral therewith as the rectifying means, which is the same rectifying means used by defendant, the discovery and utilization of which, according to its advertisements, ended "the long search of scientists for the final, perfect system of current rectification." It is apparent, also, we think, from a study of the proofs, that the patent accomplished what it claims to accomplish. The principal argument against this conclusion is that it is essential to the utility claimed in the specifications that the discs be cooled quickly by quenching, and the patent does not show this step. The lower court thought that the quenching probably improved effectiveness, but concluded that the device was undoubtedly operative whether there was or was not quenching. We are of the opinion that the proofs convincingly show that quenching is not essential to useful operativeness. It is perhaps true that the quenched device is more efficient, but patentability in a novel and useful device is not to be defeated because of susceptibility to improvement in operative efficiency. Telephone Cases, 126 U. S. 1, 8 S. Ct. 778, 31 L. Ed. 863; Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112; Gordon Form Lathe Co. v. Walcott Mach. Co., 32 F.(2d) 55 (6 C. C. A.).

■ The first of the prior publications cited against the patent is an article published by Schuster in the Philosophical Magazine in 1874, giving the result of some of his experiments with a small magnet in a coil. He observed deflection caused, as he concluded, by a short piece of copper wire connected with his galvanometer. Upon cleaning the wire this effect disappeared, but by burying it in charcoal for several hours it reappeared in different degrees. Schuster himself regarded these effects as unstable. The most plausible explanation he could give was that "a thin layer of air may sometimes intervene between the two wires which are screwed together." The Braun publications in 1877 and 1878 discuss the Schuster experiments. Braun attributed the unilateral conductivity that Schuster observed to a thin layer of cuprous or cupric oxide, he himself having already observed the same phenomena in connection with super oxide manganese. It was his view that the "anomalous phenomena appear most readily, when at least one electrode is small." As to the effect of these foreign language publications of Braun, see Permutit Co. v. Wadham, 13 F.(2d) 454–456 (6 C. C. A.), not affected on this point by Permutit Co. v. Graver Corp., 52 S. Ct. 53, 76 L. Ed. ——. Fleming, in his book on rectifying detectors, discusses the observations of other scientists in experimenting with thermo-detectors, concluding that "the rectification depends in some cases upon a surface action and in others upon the internal structure of one of the materials." The Hornemann article describes a thermo-detector operated by a battery, the contact being at "a point." Schloemilch apparently omitted the battery, but his detector, as well as Hornemann's and others, had the point contact. Nesper points out in his article that "the essential characteristic of all of these thermo-detectors consists in the fact that there is no line or surface contact, but that the place of contact is at a point."

All of these prior publications related to laboratory experiments, and while they undoubtedly disclosed the rectification of small currents by point contacts, none of them suggested large current rectification over a relatively wide area at the internal boundary between a copper plate and cuprous oxide formed thereon. Nor is there such suggestion in the earlier patents. The British patent to Thompson, No. 21,408, issued in 1907, was for an improved detector for wireless telegraphy. The rectification of minute currents which it effected was brought about by contacting soft metal with the sharp edge of a copper disc having a coating of copper oxide. It was wholly unadaptable to the rectification of a large current over an extended area. Other patents relied upon are of the dry electrolytic type in which the active element is an electrolyte placed between two electrodes. In Garretson, No. 929,582, which belonged to that type, the rectifying element consisted of a plate or film of silver sulphide. In this device, as in others of that kind, the

rectification does not take place immediately, but must be formed, and the rectifying element is subject to slow decomposition. None of these earlier devices, including Thompson's, used a copper disc or plate with cuprous oxide formed thereon and integral therewith so that the deflection or rectification would take place over a relatively wide area at the internal boundary of the two. This is the embodiment of Grondahl's invention, as called for in claims 10 to 14, inclusive. Claims 1 and 2, however, cannot be sustained. These claims would be met by a piece of copper of any size or shape having thereon a splotch of cuprous oxide of any size or shape. There is no suggestion in either of them of internal boundary rectification over a relatively wide area, which, as we have said, is the essence of the Grondahl invention. This feature, which is called for in claims 10 to 14, inclusive, is not disclosed in any of the earlier devices, and we find nothing nearer it in the laboratory observations than the point rectification which, in view of the long need for a large scale rectifier, cannot be said to teach Grondahl.

The remaining claims in suit, 7 and 15 to 20, inclusive, do not call for a copper disc or plate, but call for rectifying means formed at the junction of two dissimilar bilaterally conducting bodies integrally joined together over an extended area. While the specifications in original form do not limit the base member to copper but suggest as an example a copper plate and a surface coating of cuprous oxide formed thereon, they nowhere describe such other metals in their physical characteristics. Grondahl assumed, without determining by test or otherwise, that two dissimilar bilaterally conducting bodies joined together would produce rectification. Without identifying in his specifications such bodies except in terms of function, he undertook to claim all substances in which the function might be found. This he could not do. Heidbrink et al. v. McKesson, 290 F. 665 (6 C. C. A.), and Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868.

Infringement is clear. The real invention is the effective means of rectification—the copper plate with cuprous oxide formed thereon over a relatively wide area. This has been appropriated by defendant. The slightly different means used by defendant to make current connection does not relate to the substance of the invention. But if it were otherwise, infringement would remain. Grondahl employs a sheet of lead foil under pressure against the cuprous oxide, while the defendant makes its connection with the outer surface of the oxide side after reducing it or removing the outer film of cupric oxide therefrom. Either, it seems to us, is the equivalent of the other.

The decree is affirmed on both appeals.