**ALUMINUM CO. OF AMERICA v. THOMP-
SON PRODUCTS, Inc.**

**THOMPSON PRODUCTS, Inc., v.
ALUMINUM CO. OF
AMERICA.**

Nos. 8329, 8330.

Circuit Court of Appeals, Sixth Circuit.

Oct. 9, 1941.

797

Drury W. Cooper, of New York City
(C. Blake Townsend, of New York City,
on the brief), for Aluminum Co. of America.

John H. Bruninga, of St. Louis, Mo., for
Thompson Products.

Before HICKS, SIMONS, and ALLEN,
Circuit Judges.

SIMONS, Circuit Judge.

We have heretofore had presented to us
the problems encountered in the search for
an aluminum piston that could be recipro-
cated in the iron cylinder of an internal
combustion engine with minute clearances.
Our previous study was directed to patents
involving the structure of such pistons de-
signed to overcome the difficulties present-
ed by the relatively higher thermal ex-
pansivity possessed by aluminum over other
metals.[1] The patents involved in the pres-
ent infringement suit concern themselves
with the composition and solidification of
aluminum alloys and have for their ob-
jectives increase in the properties of tensile
strength and ductility and a lowering of the
thermal expansivity of the metal utilized.

The patents in suit are Archer and Ed-
wards, No. 1,572,459, granted February 9,
1926, upon an application filed November
27, 1920, directed to "making castings of
aluminum-silicon alloys," and Archer and
Kempf, No. 1,799,837, granted April 7, 1931,
upon an application filed December 22, 1928,
for an "aluminum base alloy and piston
made therefrom." Of the first patent,
claims 1, 2, 3, 4, 6, and 13 were held invalid,
and claim 7 valid but not infringed. It is
from the decree of invalidity of the claims
other than 7, and from the holding of the
non-infringement of claim 7 that the plain-
tiff appeals. Claim 1 of the second patent
was held to be valid and infringed, and
this phase of the decree, together with the
holding that claim 7 of the first patent is
valid, is assailed by the cross-appeal of the
defendant below.

We are told that aluminum has been used
commercially only since about 1889 when it
was made available by the invention of the
Hall electrochemical process. Pure alumi-
num being light and ductile, but not very
strong, had from the beginning been al-
loyed with other metals to improve its
strength, hardness, or other properties,—
copper and zinc being the most commonly
used metals for that purpose. For many
years there had been controversial dis-
cussion in scientific literature of aluminum-
silicon alloys, leading to the belief that
silicon was an undesirable and dangerous
impurity in its effect upon aluminum, and
so to be avoided. There was, therefore, no
practical art of aluminum-silicon alloys pri-
or to 1920 when Dr. Pacz began conduct-
ing experiments which led to his patent
No. 1,387,900 for what is known as a "chem-
ical modification" method, which involved
treating molten aluminum-silicon alloy with
a chemical modifier. The effect of the Pacz
invention, and of his later patents, was to
stimulate great activity in research upon
aluminum-silicon alloys by the appellant and
others, leading to the discovery of chemical
modifying agents other than those disclosed
by Pacz, but producing similar results. Lit-
tle use was made of the chemical modifica-
tion method by the practical art because of
non-uniformity of product. It was not un-
til the Archer and Edwards disclosure that
there developed an aluminum-silicon in-
dustry of substantial magnitude.

The inventors claim to have discovered
that better and more uniform results could
be obtained by a simple mechanical process
of casting the alloy; that by a properly
controlled and sufficiently rapid rate of
cooling and solidification a beneficial and
fundamental change in its character could
be produced with improvement in the re-
sulting casting; that this change differs
not in degree but in kind from that pro-
duced by rapid cooling of other alloys as
they had been solidified in the prior art.
Their patent recites the behavior of other
alloys when rapidly solidified, and the mer-
its of rapidly solidified aluminum alloys
containing silicon in substantial amount.
Their chief object was to provide a simple
and effective method of making aluminum-
silicon alloy castings with greatly increased
tensile strength and ductility, and was based
upon the alleged discovery that such alloys
are markedly affected by the rate of solidi-

[1] Cleveland Trust Co. v. Schriber-
Schroth Co., 6 Cir., 92 F.2d 330;
Schriber-Schroth Co. v. Cleveland Trust
Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed.
34; Cleveland Trust Co. v. Schriber-
Schroth Co., 6 Cir., 108 F.2d 109;
Schriber-Schroth Co. v. Cleveland Trust
Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed.
132; Cleveland Trust Co. v. Berry, 6
Cir., 99 F.2d 517.

fication. They asserted that rapid cooling produces such fundamental change in the character of the structure of the alloy as is illustrated by micrographs showing the change not only in the relative sizes and arrangement of the silicon and aluminum constituents, but also their relative quantities.

Of the claims of Archer and Edwards in suit, claims 1, 2, 3, and 4, printed in the margin,[2] are for a method of making castings of aluminum-silicon alloy, and claims 6, 7, and 13, likewise set forth in the margin,[3] are for a product resulting from the practice of the method. It will be noted that of these claims, claim 7 alone is specific with respect to the amount of silicon employed in the method, or as a constituent of the product. Other claims not in suit recite differing limitations or merely as in claim 13 that the amount of silicon and other alloys is substantial. Both master and court in the trial below concluded that the absence of silicon limitations in the claims other than claim 7, invalidated them. The appellant, however, points to the specification as indicating that the amount of silicon can be varied considerably but should not, in general, be less than 3% nor more than about 15%. It urges upon us the application of the rule that claims must be read and construed in the light of the specification and so liberally interpreted as to uphold and not destroy the right of the inventor in the substance of his invention. Westinghouse E. & M. Co. v. Quackenbush, 6 Cir., 53 F.2d 632, and cases therein cited. We are of the opinion that the rule there applied is limited to claims that are ambiguous and so require construction, and is in no event applicable where it appears to be clear that the inventor sought a broader monopoly than would seem to be justified by his invention as he has described it. Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills, 6 Cir., 209 F. 210; Union Switch & Signal Co. v. Kodel Elec. & Mfg. Co., 6 Cir., 55 F.2d 173; In re Lowry, Cust. & Pat. App., 93 F.2d 909; Cf. Kalle & Co. v. Multazo Co., 6 Cir., 109 F.2d 321. In the first of the cited cases the general rule is clearly stated to the effect that a claim which is capable both of broad and narrow construction in the light of the specification will be given that construction which sustains the patent, but therein it is held that "where, from the specification or the history of the application or the language of the claim it is clear that the patentee intended to claim and the Patent Office intended to grant the broader monopoly which turns out to be invalid, the courts will not, for the arbitrary purpose of saving the claim, read into it a limitation which it does not have." [209 F. 213.]

The appellant would have us interpolate into the defeated claims of its patent a limitation upon the silicon content of the patented alloy not there expressed. Not only are the claims held to be invalid without ambiguity, but it would appear to be clear that the inventor intended to claim the broader and not the more limited monopoly. A comparison of claim 6 with claim 7 illustrates the point. Were we to interpret claim 6 as containing the limitation of claim 7, to-wit: "not less than about 3 nor

[2] 1. The method of making castings of aluminum-silicon alloy, comprising filling the mold with the molten alloy and causing the silicon in the alloy to take the form of minute particles by solidifying the alloy rapidly.

2. The method of making castings of aluminum-silicon alloy, comprising filling the mold with the molten alloy and by rapid cooling producing a fine-grained structure in the solidified alloy and causing fine dispersion of the precipitating silicon in the form of minute particles.

3. The method of making castings of aluminum-silicon alloy containing a metal capable of forming a solid solution in aluminum, comprising filling the mold with the molten alloy and by rapid solidification causing fine dispersion of the silicon in the form of minute particles.

4. The method of making castings of aluminum-silicon-copper alloy, comprising filling the mold with the molten alloy and by rapid cooling causing the alloy to solidify with a fine-grained structure and the precipitating silicon to take the form of minute particles.

[3] 6. As a new product, a chill casting of aluminum-silicon alloy, characterized by minute subdivision of the silicon, and increased strength and ductility.

7. As a new product, a chill casting of aluminum-silicon alloy containing not less than about 3 nor more than about 15 per cent silicon, characterized by minute subdivision of the silicon, and high strength and ductility.

13. As a new product, a chill casting of aluminum alloy containing substantial amounts of silicon and copper, characterized by minute subdivision of the silicon and increased strength and ductility.

[redacted]

more than about 15% silicon," the two claims would be identical, there being no material differentiation between the phrase "increased strength and ductility" in claim 6, and the phrase "high strength and ductility" in claim 7. The absence of the limitation upon silicon content in the claims held to be invalid, and the varying limitations in the claims not in suit, are significant in view of the statement of the Primary Examiner, noted as a fact in the Lowry case [93 F.2d 914], that "small changes in percentages of the ingredients often produce alloys of totally different characteristics." We are in agreement with the decision below that claims 1, 2, 3, 4, 6, and 13 of the Archer and Edwards patent are invalid because broader than the invention. It is unnecessary, therefore, to discuss other grounds of invalidity or to determine whether claim 13 is anticipated by any of the Pacz patents.

[redacted] As already indicated, the court below held claim 7 of Archer and Edwards, valid but not infringed. Since invalidity of claim 7 is one of the points designated by the defendant as a ground for its cross-appeal we must adjudicate the challenge even if in agreement with the court below on the question of its infringement. Electrical Fittings Corp. et al. v. Thomas & Betts Co. et al., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263. It is sufficient for us to say, however, without detailed discussion, that in accord with the court below we hold it valid as against the cross-appellant's attack upon it, for the reasons set forth in the opinion of the district judge, 25 F.Supp. 175, 182. Given the limitations which define the invention, the court agreed with the master "that in this limited field, where investigation and experiment by most competent technicians was intense, the patentees discovered, what others had overlooked, that rapid chill casting of an aluminum-silicon alloy produced by a simpler method than was then understood, the desirable features of physical structure and properties set forth in the patent, and that having been granted a patent clothed with the presumption of validity, on which has been built what is well termed an aluminum-silicon industry of substantial magnitude, it should be held that their advance in the art was inventive and not the result of the skill of the art."

[redacted] With the court's holding of non-infringement of claim 7 we must also agree. The defendant's pistons contain copper, magnesium, manganese, iron and zinc. While it is true that the mere addition of an ingredient to a patented combination, even if improvement is achieved, will not avoid infringement [Haynes Stellite Co. v. Chesterfield, 6 Cir., 22 F.2d 635], the question is always whether a new and different combination results. Certainly the patentees may not exclude from their field of monopoly every alloy of aluminum which contains silicon. The question of infringement is one of fact and the concurrent findings of non-infringement by both court and master are not lightly to be rejected. The teaching of the patent is that the beneficial results to be obtained from its practice are brought about by the presence of a more or less definite amount of the silicon ingredient plus the rapid chilling of the molten metal in a metal mold, the cooling time being from 15 to 20 seconds. The evidence discloses that the defendant's alloy requires a longer time for solidification and that the added elements contribute to its hardness even when cooled with relative slowness. Dr. Jeffries, the plaintiff's expert to whose qualifications as a metallurgist both litigants paid tribute, was unable to say that the defendant used the teachings of the Archer and Edwards invention, and the master pertinently observed that if he were unable to inform him with more certainty of the facts indicating infringement, it was impossible to reach a definite conclusion about it. The district judge received a like impression from his evidence. Claim 7 is not infringed by the defendant's alloy.

[redacted] The objective of Archer and Kempf patent No. 1,799,837, was the development of an aluminum base alloy having a low thermal expansivity without the sacrifice of the physical and mechanical properties which make such alloys suitable for pistons. These properties include a fairly high hardness and a reasonable degree of toughness, and the alloy furthermore should be of such consistency as to be easily machined. Of the claims of this patent, the first alone is in suit, and reads: "An aluminum base alloy containing from about 7 to 15% of silicon, from about 0.2 to 3% of magnesium, from about 0.5 to 7% of nickel and from about 0.3 to 4% of copper." The master held the claim to be invalid as showing no patentable advance on prior art. The court disagreed and sustained validity. It rejected the substitutions and transpositions made in the name of equivalency by which

it was sought to prove that prior art alloys so resembled the patented alloy that invention was absent. As in Re Lowry, supra, it was here also observed that in the case of complex alloys it is impossible to say in advance just what might be the effect of changing ingredients or their proportions. The court was also led to its conclusion by the fact that experimenters, highly skilled, pursued their research over a period of several years, during which the art appreciated the desirability of an aluminum-silicon alloy with low thermal expansion without success, until the disclosure of the patent in suit. With these conclusions on the question of validity we find ourselves in agreement notwithstanding the view of the master that only routine experimentations were involved. We find here no such clear charting of the road and direction for research as invalidated the patent for want of invention in Hamilton Laboratories v. Massengill, 6 Cir., 111 F.2d 584.

The court, however, found infringement in the defendant's pistons and decreed relief. To this we do not agree. In a crowded art, and particularly one dealing with alloys, where, as already noted, small changes of percentages often produce alloys of totally different characteristics and where, as here, the inventors have precisely limited their invention to the percentages recited in the claim, we are precluded from interpreting as within the monopoly of the patent that which the inventors meticulously excluded. The claim calls for 0.5 to 7% nickel. It is demonstrated by the evidence that the defendant's pistons do not reach this minimum in nickel content. It is true that they approach it, the nickel range being from .04 to 0.45. The court below thought that this deficiency in nickel made departure from the patented formula merely colorable, although it was strongly urged that the presence of nickel was accidental only and an impurity rather than an ingredient. The evidence, however, discloses that such minute percentage of nickel has no substantial effect upon the alloy. According to Dr. Jeffries the nickel content lowered thermal expansivity but little, and achieved but minimum increase in initial hardness. The defendant gained hardness by a percentage of manganese which Dr. Jeffries conceded was not only a very good hardener but helped to reduce the coefficient of expansion. There was, moreover, evidence that there would have been no difference in the alloy if the nickel had been entirely omitted. In the light of this exposition, with the burden of proof upon the plaintiff to establish infringement, we are unable to conclude that it was sustained.

Insofar as the decree is challenged by the appeal, it is affirmed. Insofar as it is brought into question by the cross-appeal, it is reversed, and the cause remanded to the court below with instructions to dismiss the bill.