**OLYMPIC FASTENING SYSTEMS, INC.,**
**Plaintiff-Appellee,**

v.

**TEXTRON, INC., Defendant-**
**Appellant.**

**No. 74-1203.**

United States Court of Appeals,
Sixth Circuit.

Oct. 16, 1974.

---

Murray S. Monroe, Taft, Stettinius & Hollister, Cincinnati, Ohio, John M. Webb, Russell D. Orkin, Pittsburgh, Pa., for appellant.

John W. Melville, Melville, Strasser, Foster & Hoffman, John D. Hayes, Cincinnati, Ohio, for appellee.

Before PHILLIPS, Chief Judge, EDWARDS and LIVELY, Circuit Judges.

LIVELY, Circuit Judge.

This patent case is concerned with the art of riveting, especially as it is practiced in the aircraft industry. In the manufacture of airplanes it is necessary to join sheets of metal together by riveting under circumstances where the riveter cannot see or reach behind or inside

the sheets being joined. For this reason "blind" fasteners were developed in which a tubular rivet consisting of a fixed head and a hollow sleeve has inserted within its core a stem which is enlarged or serrated on its exposed end so that a pulling-type rivet gun can activate it. The lower end of the stem, which extends beyond the inner sheet of metal, contains a tapered joining portion and a "blind head" which has a larger diameter than .the stem or the sleeve of the tubular rivet. The blind head of the stem "upsets" or expands the lower end of the sleeve into a "tail" when the pulling force of the rivet gun forces it upward into the sleeve. This presses the inner sheet upward, closing any space that might have existed between it and the outer sheet. During this operation the exposed head of the rivet is held tightly against the outer sheet by the rivet gun. Thus, the sheets of metal are clamped or "clinched" together. The Cherry patent No. 2,183,543, not in issue here, was a pioneer in blind riveting, but the joinder it achieved was "non-structural" because the connecting sleeve between the riveted parts remained hollow.

The Huck patent No. 2,501,567 achieved a structural joinder by extruding and deforming the stem—a process known as "wiredrawing"—to fill the hollow sleeve of the tubular rivet. This was accomplished by pulling an enlarged section of the stem through the sleeve and expanding the sleeve by forcing its sides tightly against the holes in the plates being joined and filling the sleeve with the extruded stem. The "blind-head upset" occurred when a second larger section of the stem further enlarged the sleeve on the blind side of the metal sheets to form the tail. Since upset took place after the hole filling was completed rather than before it was begun, satisfactory clamping or clinching of the riveted sheets was not achieved. The Huck patent was concerned with

hole filling rather than clamping and did not specify the dimensions of the various parts.

So far as this record discloses the first blind rivet-type fastener that successfully dealt with both the problems of clamping and hole filling was Gapp patent No. 2,931,532, issued April 5, 1960. It was the first "self-plugging" fastener which also achieved satisfactory clinching. The application for this patent stated that it related to a "blind type rivet wherein the stem of multipiece rivet is pulled to first expand the tubular rivet shank and clinch the sheets together and thereafter wiredraw to expand the rivet to fill the hole in the sheets . . . ." By increasing the strength of wiredrawing and enlarging the dimensions of the stem, tapered shoulder and blind head of the fastener, Gapp perfected a device which clamped the sheets securely together without leaving a nonstructural hollow tube. This breakthrough was discovered by accident, but met a long-felt need in the aircraft and rivet industries. The sequence of events in the riveting process is important. In the Gapp patent, with the first movement of the joining portion upward the bottom of the tubular rivet is upset, or forced outward to form a tail, pressing the lower plate against the upper, or exposed one. With the clamping complete, pulling is continued and the sleeve is plugged by wiredrawing the blind head.[1]

The Gapp patent is owned by Textron. While the application was being prosecuted in the Patent Office, Textron's predecessor granted a non-exclusive license to Olympic. Thereafter the plaintiff began to manufacture and distribute Olympic-Lok rivets which are also blind-head, hole-filling fasteners for use in the aircraft industry. Olympic has paid Textron royalties on other fasteners which it admittedly makes under the licensing agreement, but has never paid royalties on Olympic-Lok rivets. The Olympic-Lok rivet is manufactured and

1. See Appendix I
Figure 1, A through D shows the Gapp invention at various stages in the fastening

process. The labels were not on the illustration when it was filed with the patent application, but were added by a trial witness.

sold under patent No. 3,285,121, issued on November 15, 1966 to an Olympic employee, George Siebol, and subsequently assigned by him to Olympic.

This suit was brought as a declaratory judgment action by the licensee seeking a declaration that the Gap patent is invalid and, if valid, that it is not infringed by the Olympic-Lok rivet. The decision of the district court upholding the validity of the Gapp patent has not been appealed. Thus the only questions before this court relate to infringement. Olympic presented three arguments in support of the contention that its fastener is not within the claims of the Gapp patent. The district court made findings on each of these propositions, rejecting two of the plaintiff's arguments and adopting one. The ultimate conclusion of non-infringement made it unnecessary for the court to deal with Textron's counter-claim in which it sought an accounting for royalties on the Olympic-Lok rivet, costs and attorney fees.

The three findings of the district court on the question of infringement may be summarized as follows:

(1) An important distinction between the Gapp patent and the earlier Huck invention was that the size of the blind head of the Gapp fastener beyond the pulling part is of "substantially uniform diameter through its length." The Huck device had a large protrusion at the bottom of the stem. Although the blind head of the Olympic-Lok rivet varies from five to fifteen percent in diameter over a very small distance, the court held that in the context of the Gapp claim, "the Olympic head is of substantially uniform diameter. The smaller waist measurement in Olympic serves no purpose at all and from a point of view of what is to be accomplished the diameter of Gapp and Olympic are the same."

(2) In Gapp the blind head is upset completely in a single step while in Olympic the upset occurs in two operations. The district court found that the single-step upset of the Gapp device provided the clamping or clinching required by the aircraft industry, and that the second stage upset of the Olympic fastener merely formed a larger tail which "serves absolutely no purpose."

(3) The district court found the Gapp requirement that the *"joining portion and said blind head are pulled into and through said tubular rivet . . ."* (Claim 1, emphasis added) means these components must be pulled "through and out." The parties have referred to the questions determined by these findings as "sub-issues" under the general issue of infringement. The court's finding on the third sub-issue resulted in a holding of no infringement, and we will deal with it first.

Claim 1 of the Gapp patent,[2] which is reproduced in full in the margin, con-

2. 1. A rivet assembly for tightly securing plates together under stress of use, said rivet assembly including a tubular rivet snugly fitting into aligned holes in the plates to be riveted, said tubular rivet having a shank and a head on one end of the shank and a tail on the other end of said shank, said shank and said tail being of substantially the same outer diameter throughout their entire combined length and of smaller diameter than said head, a stem extending through said tubular rivet tail, shank and head, said stem consisting of a pulling portion extending beyond said head and being readily slidable through said tubular rivet, and an elongated and radially enlarged blind head extending beyond the blind end of said pulling portion, said blind head being of substantially uniform diameter throughout its length, and a joining portion between said pulling portion and said blind head, said joining portion tapering outwardly from said pulling por-

tion to said enlarged blind head and being adjacent the tail of said tubular rivet, the angle of said taper and said substantially uniform blind head diameter and the wire-drawability of said tapered portion and said substantially uniform blind head being such that with the rivet snugly fitting into the aligned holes the tapered joining portion, upon reaching the region of the adjacent plate, will fully clinch the plates and completely expand the rivet tail against the corners of the hole in the adjacent plate in a single head-forming operation to the finished size of said clinching tail, and after said clinching and complete tail formation said tapered joining portion and blind head will be wire-drawn as said joining portion and said blind head are pulled into and through said tubular rivet for expanding the shank of the latter tightly against the sides of said holes in said plates.

tains the language which the district court found to be decisive. The evidence disclosed that in the Olympic-Lok rivet the stem contains a notch or groove in a position which is even with the top of the rivet head when the pulling action of the rivet gun is completed. The stem can be broken off flush with the exposed head without the necessity of trimming. The court noted that in its formal description of the Gapp invention, the defendant's Exhibit No. 43 shows a separate step to demonstrate the completion, after illustrating the hole filling. At this completion stage, both in the description and illustration, a portion of the shoulder and blind head are completely through and above the top of the exposed rivet head. In the Gapp specification, after describing the upset of the blind head and the clinching of the sheets together, it is stated that "the enlarged head of the stem is further wiredrawn until the connecting part or the reduced portion of the enlarged head is pulled through the rivet head substantially in the position shown in position 'D' in Fig. 1." Position D [3] shows the joining portion clearly beyond the end of the rivet head. The specification also refers to a step in which "the projecting end of the stem is trimmed off substantially flush with the rivet head." The district court determined that "through" as used in the concluding sentence of Claim 1 of the Gapp patent has the meaning of "through and out of." This finding was based upon language of the specification and the Claim itself in addition to such external evidence as a dictionary definition of "through" and a memorandum from the inventor to his supervisor written shortly after the invention was perfected.

■■ The Supreme Court, in dealing with validity of a patent, has stated the fundamental rule that patent claims are to be interpreted "in the light of the specifications and both are to be read with a view to ascertaining the invention." United States v. Adams, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966). In Westinghouse Electric & Manufacturing Co. v. Quackenbush, 53 F.2d 632, 634 (6th Cir. 1932), this rule of construction was applied to patent infringement cases as follows:

> The claims must be read and construed in the light of the specification, and so liberally interpreted as to uphold and not destroy the right of the inventor in the substance of his invention.

Our examination of the specification of the Gapp patent convinces us that the word "through" was not used in the restricted sense of "through and out of." While it is clear that the pulling stem is drawn completely through and out of the hollow sleeve or tubular rivet, the connecting portion and wiredrawn blind head, referred to collectively by one witness as "the upsetting portion of the stem," are only required to be drawn into and through the hollow sleeve to a predetermined distance, which may be either flush with the exposed rivet head or beyond it. Reproduced here, with emphasis added, is Column 1 lines 45–71 of the specification of the Gapp patent as granted:

> Particular features of this invention include *pulling a stem through a tubular rivet* so as *to pull an elongated blind head into the tubular rivet* in the work so that the blind head first expands the tubular rivet wall against the blind side of the work, draws the sheets or work together, and then expands the tubular rivet against the hole in the sheet or work and substantially simultaneously the said blind head is reduced in diameter, or wire drawn, so as to fill tightly the enlarged and expanded passage in the tubular rivet, and then *the wire drawing of the stem is continued by pulling the stem until the blind head on the stem is pulled into the rivet to the predetermined extent.*

In other words, in a rivet assembly consisting of a tubular rivet with a

---

3. See Figure 1–D, Appendix I.

head on one end and a stem extended through the rivet, said stem having on its blind end a so-called blind head, *the stem is pulled through* the tubular rivet so as to first expand the tail of the tubular rivet against the corner of the hole or work and draw the work together, *then to reduce the diameter of the blind head by wiredrawing it so that it can be pulled into* the rivet so as to expand the side walls of the rivet against the hole, and *then to further wire draw the blind head* of the rivet by continued pull until the entire length of the tubular rivet is expanded against the hole and the drawn or reduced blind head tightly fills the interior of the tubular rivet; *then stopping the pull when the wiredrawn portion of the head reaches or passes through the rivet head.*

It can be seen that the words "into" and "through" are used variously and that the distance which the joining portion and blind head are pulled is described by other words such as "predetermined extent" and "reaches or passes through the head."

The specification also refers to accompanying drawings which illustrate various embodiments of the invention. In addition to Figure 1-D which shows an embodiment in which part of the connecting portion and blind head have been pulled beyond the exposed head and must be trimmed off, modifications which are claimed as protected embodiments of the invention are shown in other figures. With respect to Figure 4,[4] the specification states:

The modified form of the stem shown in Fig. 4 is preferably used in connection with the type of stem which has a pulling head 9 and is provided with a weakened portion or groove 32 which determines the distance at which the pulling action should cease. As the stem is pulled through the work it is pulled until the groove 32 is approximately flush with the top of the head 3 of the tubular rivet 2. Then the stem could be bro-

ken off by merely bending the portion of the stem which projects beyond the groove 32 and thereby the necessity for special trimming tools may be eliminated.

Olympic contends that a study of the file wrapper history of the Gapp patent discloses that Figure 4 relates to an abandoned claim. As is often the case, many claims of the original Gapp application were found not to warrant inclusion in the patent as granted. Olympic argues that Gapp's original Claim 1 was broad enough to include a stem with a notch to permit a break flush with the exposed rivet head (Figure 4), but that when that Claim was abandoned this embodiment was abandoned with it. However, the original Claim 1 was a method claim, rather than a claim on the fastener itself. This and amended Claims 1, and 2 were rejected by the Patent Office on the ground that the steps described therein were fully described in the prior Huck patent. Later the Patent Office rejected Gapp Claim 12 on the ground that the difference between Gapp and Huck was one of design of the stem and blind head rather than one of method. The file wrapper discloses disagreement over whether the method claims were disclosed by the earlier Huck patent, but nothing about whether the wiredrawn blind head was pulled beyond the exposed rivet head or only flush with it.

Gapp also abandoned method Claim 18 which described the notched stem illustrated in Figure 4 and stated that the wiredrawing of the blind head could be stopped when the joining portion reached the "region" of the exposed rivet head. The reason for abandonment was the patent examiner's objection that it was "considered to recite no more than the obvious and expected use of the rivet of claim 16." The Claim 16 referred to by the examiner is the same as the final Claim 1 of the patent. Thus a separate claim embodying Figure 4 was treated as unnecessary because it was merely descriptive of the use to be

4. See Figure 4, Appendix I.

made of the patent device. Under these circumstances the cancellation of Claim 18 should not be considered an abandonment of the embodiment of the invention which it had described.

■ We have examined the cases cited by Olympic on the issue of abandonment and recognize the principles which they enunciate. However, they have no application in view of our determination that the embodiment of the Gapp invention containing a notched stem to facilitate breaking flush with the top of the exposed rivet head was never abandoned. In Nickerson v. Bearfoot Sole Co., Inc., 311 F.2d 858, 876 (6th Cir.), cert. denied, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed. 2d 50 (1963), the court held that a patentee may not include matters which the file wrapper shows to have been eliminated from the patent. Similarly, the Supreme Court has held that abandoned claims may not be revived by being read into the language of allowed claims. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 218, 61 S.Ct. 235, 85 L. Ed. 132 (1940). Here the flush-breaking stem was included in what became Claim 1, as an obvious use of the device. It was not eliminated or abandoned.

In Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126 (1942), the original patent application contained six claims, all of which were rejected by the examiner. Amendments were then submitted, four of which were eventually allowed. The Court interpreted the claim language "embedded in" and held that two accused devices embedded in a table but not wholly contained within it infringed on the patent. However, the Court also applied the doctrine of "file wrapper estoppel" to find no infringement by other accused devices not embedded in a table since the patentee had abandoned the words "carried by" in favor of "embedded in." We find no basis in the file wrapper history of this case for allowing the defense of file wrapper estoppel even if otherwise applicable. Gapp did not adopt the word "through" as a substitute for less restrictive language. Furthermore, the defense of file wrapper estoppel only applies where infringement is shown under the doctrine of equivalents. Kolene Corp. v. Motor City Metal Treating, Inc., 440 F.2d 77, 82 (6th Cir.), cert. denied, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). The district court made no finding on equivalency, and we do not deal with that question. See Graver Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). This sub-issue deals with interpretation of the Claim and a charge of literal infringement. Thus we have considered the file wrapper history as an aid to interpretation of the Claim, and specifically to determine whether there has been an attempt to revive abandoned claims.

Olympic also points to an admission by the inventor Gapp that the "joining portion" should be visible above the exposed head to facilitate inspection. This was described as a bonus of the invention. Facility of inspection from the visible side was listed in the specification as one of the accomplishments of the Gapp device. However, another advantage cited by Gapp in a memorandum to his supervisor Ketchum was that the stem could be notched and the notched portion pulled flush or just below the exposed head. The fact to be determined by inspection is whether the sleeve is completely filled and expanded tightly against the holes in the plates at the end of the operation. This may be observed as readily by examining a completed operation where the filling portion is sheared off flush with the top of the exposed rivet head as where a portion of the filling material extends beyond the head and requires a separate step to trim it flush. Our consideration of the cited evidence leads to the conclusion that Mr. Gapp had both versions of the fastener in mind at the time of the invention. The inventor testified that ease of inspection was "no part of the surprise of the invention."

Turning to the Claim itself, we note that the concluding language of Claim 1, which was relied on by the district court and Olympic, refers to pulling the joining portion and blind head into and

through "said tubular rivet." Nowhere does the Claim say that the joining portion or blind head is pulled beyond the exposed head. In both the Gapp device and the Olympic-Lok rivet the joining portion and wiredrawn blind head are pulled through the full length of the tubular rivet. Furthermore, in the same sentence of the Claim the purpose of pulling the joining portion and blind head through the tubular rivet or sleeve is stated to be "for expanding the shank of the latter tightly against the sides of said holes in said plates." In other words, these parts are pulled through the sleeve in order to fill it and force it tightly against the holes in the plates which are being joined. This "hole-filling" function is complete when the wiredrawn parts are pulled to the top of the exposed head because the entire hollow sleeve is then filled and expanded against the holes in the plates. Nothing would be added to this function of the mechanism by continuing to pull until the joining portion and part of the blind head extend beyond the exposed head.

We do not find in the use of the words "into and through" in Claim 1 a precise limitation to fasteners in which the wiredrawn elements are pulled beyond the exposed rivet head or a meticulous exclusion of fasteners whose stems are notched to achieve a break flush with the top of the head. These words do not relate to an inventive step or a substantial function of the invention. *Cf.* United Shoe Machinery v. O'Donnell, 84 F.2d 383, 386 (6th Cir. 1936). This present case differs sharply from Aluminum Co. v. Thompson Products, Inc., 122 F.2d 796 (6th Cir. 1941), and Dillon Pulley Co. v. McEachron, 69 F.2d 144 (6th Cir. 1934). In both of those cases there was clearly an express limitation in the claim of invention and the accused device departed from the claim in the very area of such limitation. By precisely limiting their claims the inventors were held to have meticulously excluded devices which differed in the particulars so limited. Nor do we believe that the widely accepted principles of Graphicana Corp. v. Baia Corp., 472 F. 2d 1202 (6th Cir. 1973), cited by Olympic, have application to the facts of this case. There a finding of noninfringement was based on determination that omission from or change in the accused device of an element in a claim of the patent resulted in a change in function. Specifically, the court found that the accused device contained no element which performed the function claimed in the patent for a "mar-proof base."

■ The decision on this sub-issue is controlled by this court's holding in Maxon v. Maxon Construction Co., 395 F.2d 330, 335 (1968), that if his claim is broad enough an inventor may claim infringement "if another uses the principle and appropriates the substance of his invention." There the court held that the one function claimed for gates on the body of a dump truck was performed alike by gates on the patent and the accused, though the gates were placed at different locations on the two. Here, the function of filling the sleeve and expanding it tightly against the holes in the clamped plates is performed in the same way in both Gapp and Olympic fasteners. With respect to the meaning of the claim language that the joining portion and blind head are pulled "into and through" the tubular rivet, we find no limitation which prevents Textron from claiming infringement by the Olympic-Lok rivet. The witness Ketchum testified without contradiction that the extent to which the blind head is pulled into the sleeve is not a part of the inventive concept of the Gapp patent. In the same vein, the inventor, Howard Gapp, testified that it is of no importance how far the blind head is pulled so long as the devices clamp-up first, followed by hole filling. He also testified that hole filling is sufficiently complete when the joining portion pulls up to the head of the rivet. There was no evidence that any function was served by pulling the blind head out of and beyond the exposed head of the tubular rivet. The Olympic-Lok fastener performs the same function as the Gapp invention, precisely in the manner of the embodiment described in the specifica-

tion and illustrated in Figure 4. To the extent that it differs from the embodiment shown in Figure 1, such difference is a non-functional variation in a device which otherwise reads on the claims of Gapp. On this sub-issue the findings of the district court are clearly erroneous.

Though Olympic did not file a cross appeal, both parties have briefed the other two sub-issues upon which the district court made findings of fact in determining the issue of infringement. By questions from the bench during oral argument, the court indicated some doubt as to whether these matters were properly preserved for review. Our holding that the district court's finding on sub-issue 3 was clearly erroneous requires that we explore the necessity of a cross appeal with respect to sub-issues 1 and 2. The Practitioners' Handbook of the Sixth Circuit (1973 Rev.) states on page 31:

**Cross Appeals**

The appellee may, without having to file a cross appeal, defend a judgment on any ground consistent with the record, even if rejected in the lower court. But he cannot attack the judgment, either to enlarge his own rights thereunder or to lessen the rights of his adversary, unless he files a cross appeal. A cross appeal is necessary even if the appellee merely seeks to correct an error or to supplement the decree with respect to a matter not dealt with below.

This appears to be a paraphrase of the rule promulgated in United States v. American Railway Express Co., 265 U.S. 425, 44 S.Ct. 560, 68 L.Ed. 1087 (1924). In that case the appellee urged on direct appeal to the Supreme Court two reasons (which it had also urged in the lower court) for affirming the district court judgment in addition to the reason relied on by the trial court. One appellant argued that the Court should not consider these additional contentions since there had been no cross appeal. Writing for the Supreme Court, Mr. Justice Brandeis characterized this argument as "unsound" and said:

It is true that a party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it. By the claims now in question, the American does not attack, in any respect, the decree entered below. It merely asserts additional grounds why the decree should be affirmed. These grounds will be examined. 265 U.S. at 435–436, 44 S. Ct. at 564.

The *Railway Express* rule was applied by the Court in Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 57 S.Ct. 325, 81 L.Ed. 593 (1937), where it was held that failure to file a cross appeal did foreclose consideration of contentions urged by an appellee. In that case, however, acceptance of the appellee's argument by the Court of Appeals had resulted in modification of the district court's decree. When an appellee seeks to have findings of a trial court revised, a cross appeal is required if such revision "carries with it as an incident a revision of the judgment." *Id.* at 191, 57 S.Ct. at 328. In Jaffke v. Dunham, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957), the Supreme Court held that a successful party in the district court may sustain its judgment on any ground that finds support in the record. It was held to be error for the Court of Appeals to refuse, on the ground that no cross appeal had been filed, to consider the appellee's claim

that the district court wrongfully ordered an affidavit stricken.

■ This court has applied the stated rule in a number of cases. In Reynolds Spring Co. v. L. A. Young Industries, Inc., 101 F.2d 257 (6th Cir. 1939), an appellee in a patent infringement suit was denied the right to argue that its damages should have been greater than the district court awarded. The court reasoned that this was an attack on the judgment of the trial court for the purpose of enlarging the appellee's rights thereunder. A similar result was reached in Third National Bank in Nashville v. United States, 454 F. 2d 689 (6th Cir. 1972), where an argument made by the appellant was viewed as leading to a result more favorable to the appellee than the district court judgment. Another rule recognized by this court is that a judgment will be affirmed, if correct for any reason, even though the reason or basis of the district court's decisions may be erroneous. Paine & Williams Co. v. Baldwin Rubber Co., 113 F.2d 840, 844 (6th Cir. 1940). The same principle has been applied to permit arguments by appellees who have not cross appealed. E. g., Cook v. Hirschberg, 258 F.2d 56 (2d Cir. 1958); Standard Accident Insurance Co. v. Roberts, 132 F.2d 794 (8th Cir. 1942).

■ Having received the full relief available to it on the issue of infringement because of the district court's holding on sub-issue 3, Olympic had no occasion to file an appeal. The appeal by Textron put the correctness of the district court judgment in issue, and Olympic was not required to file a cross appeal in order to seek affirmance of that judgment on the basis of arguments expressly rejected by the district court. Swarb v. Lennox, 405 U.S. 191, 202, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972) (concurring opinion of Mr. Justice White).

In contrast to sub-issue 3, the record with respect to the other two sub-issues reveals a distinct conflict in the evidence. The first such issue—whether the Olympic-Lok rivet has a blind head of "substantially uniform diameter"— was the subject of testimony by expert witnesses for each of the parties. As originally filed, the Gapp Claim did not prescribe a uniform diameter throughout the length of the blind head. The Patent Office objected that there was nothing to distinguish the makeup of the lower stem from that of prior art devices which achieved clamping with a plug or "external proturberance" which upset the tail of the rivet after the stem had been pulled completely through the sleeve, leaving a hollow tube. To distinguish the functions its blind head performs—that of clamping first and then filling—from previous patented devices, the Gapp Claim was amended by inserting the words referred to.

■ The change in diameter of the Olympic-Lok fastener from one end of the blind head to the other is minute. It appears from examining actual rivets and illustrations filed as exhibits that there is a second small flare at the end of the Olympic-Lok blind head. A witness for Textron testified that illustrations [5] which he filed as exhibits were accurate enlargements of the actual Gapp and Olympic-Lok fasteners and an example of the prior art and that when they are superimposed and compared with the prior art, Gapp and Olympic are both of substantially uniform diameter. Since the Gapp claim requires that the blind head be "substantially" rather than absolutely uniform throughout its length, unless the second flare on the Olympic device performs some function not performed by the Gapp fastener, this feature alone will not avoid infringement. The expert witness, Ketchum, testifying for the defendant, stated that the blind head on the Olympic-Lok rivet is structurally similar to that of the Gapp device and that from a functional standpoint the two devices perform in the same manner. Furthermore, testifying as one skilled in the art, this witness expressed the opinion that the blind head of the Olympic-Lok fastener is of substantially uniform diameter.

5. See Appendix II for one of the illustrations.

This testimony is substantial evidence in support of the district court's findings and conclusions on this issue. Although interpretation of the claim language of a patent involves legal rules of construction, the question of whether an accused device is within the language of a claim is treated as a question of fact to which the "clearly erroneous" rule (Rule 52(a), Fed.R.Civ.P.) applies. Ballantyne Instruments & Electronics, Inc. v. Wagner, 386 F.2d 789, 790 (6th Cir. 1967), cert. denied, 390 U.S. 1026, 88 S. Ct. 1413, 20 L.Ed.2d 283 (1968); Maytag Co. v. Murray Corp. of America, 318 F.2d 79, 83 (6th Cir. 1963). In view of the purpose and function of the blind head in both Gapp and Olympic devices and the reason for amending the claim to add the "substantially uniform" requirement, the finding of the district court is not clearly erroneous as contended by Olympic.

The final question to be decided is whether the Olympic-Lok rivet "will fully clinch the plates and completely expand the rivet tail against the corners of the hole . . . in a single head-forming operation to the finished size of said clinching tail," thus infringing upon the quoted language of the Gapp patent. Olympic contends that the district court was clearly erroneous in finding that the Olympic device at minimum infringes on the Gapp patent under the doctrine of equivalents. The district court recognized that the tail of the Olympic rivet is not completely formed until the additional flared portion causes a second expansion, but concluded that this expansion "serves absolutely no purpose." The results of tests run by each of the parties are in the record. Gapp's tests showed that the increased tail expansion on the Olympic-Lok fastener did not add to the tensile strength (the force required to pull two riveted work pieces apart). The tests conducted by Olympic showed the opposite, and each party has assailed the validity of the tests relied upon by the other.

Although the expert witness for Olympic testified that the second "free air expansion" which takes place in operation of the Olympic fastener increases the size of the tail and adds to the strength of the joinder, he admitted on cross-examination that effective clinching does not take place unless it occurs before the hole filling begins. It was testified by Textron's expert that in operation the Olympic-Lok device removes the entire space between the plates at the first pull, or upset, or not at all. This witness stated that nothing was added to the operation by the second expansion since the function of tail forming is to pull the separated plates together and clinch them prior to plugging the sleeve. In other words, the Olympic fastener forms sufficient tail at the first stage to perform the function called for in the Gapp Claim.

The Olympic-Lok device does not appear to be a literal infringement on the language of the Gapp Claim. The district court reasoned that the critical inventive step in the Gapp patent is tail upset to provide clinching. There is substantial evidence in the record to support his conclusion that this function is performed in the same way and at the same stage in the operation of the two devices. Thus he treated the language in the Gapp patent that tail formation is completed to its finished size at the initial clinching as unimportant. This language does not appear to be an express limitation on the inventive concept. If an express limitation does not "pertain to the inventive step but rather to its mere environment," it does not preclude reliance on the doctrine of equivalents to protect against infringement. United Shoe Machinery Corp. v. O'Donnell Rubber Products Co., *supra*, 84 F.2d at 386. Under the doctrine of equivalents "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." Graver Manufacturing Co. v. Linde Air Products Co., supra, 339 U.S. at 608, 70 S.Ct. at 856. A finding of equivalence is a determination of fact which may not be disturbed unless clearly erroneous. *Id.* at 609–610, 70 S.Ct.

854. The finding of the district court on this sub-issue is not clearly erroneous.

▇▇▇ Study of the record and comparison of the two devices in question lead to the conclusion that the Olympic-Lok fastener does infringe on Gapp patent No. 2,931,532. The essential purpose of both devices is to obtain a structural joinder of metal plates to meet the standards of the aircraft industry in situations where there is a "blind" side. This function is performed in both devices by a multipiece fastener which first upsets the tail of a rivet and then plugs the hollow tube of the rivet by wiredrawing the blind head so that the sides of the tube are expanded outwardly, entirely filling the matched up holes in the work pieces. There is no difference in the function performed or in the basic structure of the two devices.

The judgment of the district court is reversed for entry of a finding of infringement and further proceedings on the counterclaim of Textron.

## APPENDIX I

PX 9A    PX 9    April 5, 1960    R. H. GAPP    2,931,532
RIVETS AND METHOD OF RIVETING
Filed April 25, 1955    2 Sheets-Sheet 1

APPENDIX II

# -6-6 RIVET

GAPP

OLYMPIC·LOK

PRIOR ART

COMPARISON